2001 ME 107

**STATE of Maine**

v.

**Joe–Pete SAUCIER**

Supreme Judicial Court of Maine.

Argued May 15, 2001.
Decided July 18, 2001.

Stephanie Anderson, District Attorney, Julia Sheridan, Asst. Dist. Atty., Portland, ME, for State.

Clifford B. Strike, Strike & Gordon, Portland, ME, for defendant.

Panel: WATHEN, C.J., and CLIFFORD, RUDMAN, DANA, SAUFLEY, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] Joe–Pete Saucier appeals from the judgment entered in the Superior Court (Cumberland County, *Delahanty, J.*) following a jury trial in which Saucier was

found guilty of manslaughter (Class A), 17–A M.R.S.A. § 203(1)(A) (Supp.2000).[1] Saucier argues the court should have granted his motion for a change of venue and that the court erred in its jury reinstructions on the presumption of innocence and on manslaughter. He further argues that evidence of causation was insufficient. We affirm the judgment.

## I. FACTS

[¶ 2] Brandi Butterfield died on December 12, 1999, from drowning in the Nonesuch River in Scarborough. Her body was located under the bed of a pick-up truck which had been driven off an embankment and which was found overturned in the river. Earlier that evening Butterfield met Saucier for the first time. Saucier was with Butterfield's friends when Butterfield joined the group at a restaurant. After leaving the restaurant, the group stopped at a residence in Old Orchard Beach where Saucier's pick-up truck was parked, and Butterfield then accompanied Saucier in his truck.

[¶ 3] Saucier drove his truck with Butterfield in the passenger seat. An Old Orchard Beach police officer began following the truck because it exceeded the speed limit. The police officer turned on his blue lights and siren for the purpose of stopping Saucier's truck, but Saucier did not stop, and a high speed chase ensued. At times the truck's speed was eighty miles-per-hour. The truck momentarily stopped when it became stuck near railroad tracks. Before the officer could reach it, the truck was backed out of its location. The truck continued traveling down a railroad bed, and the police officer lost sight of it. Moments later, however, a Scarborough police officer, whose dispatcher had alerted him about the chase, saw Saucier's truck after it turned from the railroad tracks onto a road. The Scarborough officer followed the truck on a paved road, and he saw it crash through a gate which separated the paved portion of the road from the dirt portion. After breaking through the gate, the truck continued down the rough dirt road. The Scarborough officer saw the truck drive up an earthen barrier, become airborne, and disappear. The truck had gone into the Nonesuch River where it landed upside down.

[¶ 4] Saucier was able to get out of the truck, and he yelled for help. As the Scarborough officer reached the point where the truck had gone into the river, Saucier said that someone was still in the truck. When the officer asked where in the truck the other person was, Saucier replied: "Well, she was driving."

[¶ 5] Butterfield's body was retrieved from under the truck. Resuscitation efforts failed. The medical examiner later determined that the cause of death was drowning. Saucier was charged with manslaughter, operating a motor vehicle after having been declared an habitual offender, and eluding a police officer.

[¶ 6] At trial, the State's theory was that Saucier had been driving throughout the high speed chase including at the time the truck went into the river. The forensic evidence supported this theory in that fibers consistent with Saucier's shirt were imprinted on the steering wheel, and fibers consistent with Butterfield's jacket were found on the passenger side of the windshield. Photos of Saucier taken two days after the incident showed a large bruise on his chest consistent with having slammed into a steering wheel.

---

1. Saucier was also found guilty of habitual motor vehicle offender (Class C), 29–A M.R.S.A. § 2557 (1996 & Supp.2000), and eluding an officer (Class C), 29–A M.R.S.A. § 2414(3) (1996), but his appeal is limited to the manslaughter conviction.

[¶ 7] Saucier's version was that after the chase started he and Butterfield traded positions in the truck, and she was driving at the time the truck went into the river. Saucier gave a statement to the police after the incident, which was read into evidence. According to Saucier's statement, he told Butterfield he would be arrested because he did not have a license, and she offered to switch places with him. Somewhere near the railroad tracks, they changed places, and Butterfield began driving. He asked her to keep going because he was afraid he would get arrested anyway. Butterfield asked him what to do when they encountered a gate at a dirt road, and Saucier told her to drive through it.

[¶ 8] After four days of trial and several hours of deliberation, the jury returned a guilty verdict on all counts.[2]

## II. DENIAL OF MOTION FOR CHANGE OF VENUE

### A. The Pretrial Publicity

[¶ 9] Two months before trial, the State and Saucier reached a plea agreement. The court (*Cole. J.*) rejected the agreement on June 22, 2000. The local television stations and print media covered the plea proceeding. Saucier then moved to change venue to another county on the ground that an impartial jury could not be ensured because of the pretrial publicity. The motion was supported by copies of five articles and one editorial from the *Portland Press Herald;* four articles from the *Biddeford Journal Tribune;* and three articles from the *Lewiston Sun Journal.* No affidavits accompanied the motion, but the motion alleged that four local television stations broadcast stories about the failed

plea agreement on both the evening and late night newscasts on June 22. In addition, two stations carried the news on their early morning news programs on June 23.

[¶ 10] Of the twelve newspaper articles, seven are dated mid-December 1999, and cover the death of Butterfield. They are straight forward accounts of the incident. They emphasize that Butterfield had not known Saucier previously and that Saucier was driving even though his license had been suspended previously several times. The editorial from the Portland paper is dated December 15, 1999, and it urges Maine judges to jail habitual offenders "to keep dangerous people like Joe Pete Saucier from driving." A month later, a brief account of Saucier's indictment appeared in the Portland paper.

[¶ 11] Another brief article in the Portland paper, dated June 3, 2000, reports that the State and Saucier had reached an agreement which would be presented to the court on June 22. The remaining three articles, one from each of the three newspapers, are dated June 23 and 24 and concern the failed plea agreement. Only the Biddeford paper printed this development on the front page. The gist of the three articles is that Saucier was to enter a guilty plea in exchange for a recommendation from the State that he be sentenced to seven years, but when the judge indicated that seven years was not sufficient, the deal collapsed. These June news stories briefly summarize the incident and quote or paraphrase both the prosecutor and Saucier's counsel.

### B. Jury Selection

[¶ 12] Jury selection took place on August 25, 2000. Ninety-one potential jurors

---

2. The court sentenced Saucier to twenty years for manslaughter, five years for habitual offender, and five years for eluding an officer, to be served concurrently with all but four- teen years suspended, and six years of probation. This sentence was ordered to be served consecutively to a sentence for a probation violation.

appeared for voir dire. The members of the jury panel were asked if they had seen or read any publicity concerning the case the previous December or January. Those who answered affirmatively were asked individually whether they recalled any of the details of the news stories and whether they had formed an opinion about the case from the publicity. The court denied Saucier's request to excuse all members of the jury panel who indicated they had seen or read the news stories. The twelve members of the panel who indicated they had formed an opinion on the basis of the publicity were excused for cause. Other members of the panel were excused for cause on other grounds. The court informed the remaining members of the panel that there had been news accounts of the court proceedings in the case as recently as a month ago, and the court inquired if anyone had heard or read about the case through news accounts published or broadcast after the initial news stories. None of the members of the jury panel responded in the affirmative.

[¶ 13] Following additional voir dire and challenges for cause, the panel was narrowed to forty-three members from which thirty-two names were drawn to obtain a jury of twelve members and two alternates. Before the names were drawn, Saucier renewed his motion for a change of venue which the court denied. Of the fourteen people selected for the jury, including the alternates, only three had responded affirmatively when asked about the December and January publicity. These three had read about the matter in the Portland newspaper and two had seen something on television. When asked individually if they had formed an opinion about the case, they all responded that they had not. When asked individually if they could be impartial, they all said that they could. When asked individually if they would be able to base their decision only upon the evidence presented at trial, they all answered affirmatively.

C.   Motion for Change of Venue

■■   [¶ 14] We review a trial court's denial of a motion for a change of venue for an abuse of discretion. *State v. Chesnel*, 1999 ME 120, ¶ 6, 734 A.2d 1131, 1134. A change of venue based upon pretrial publicity is required in two circumstances. The first is a situation of presumed prejudice, and the second is actual prejudice.

1.   Presumed Prejudice

■   [¶ 15] Where the publicity is so extensive and pervasive or so taints the atmosphere of the trial we will presume that an impartial jury in that location is not possible. *Id. at* ¶ 5. "Prejudice is presumed when the defendant demonstrates that the pretrial publicity has the 'immediacy, the intensity, or the invidiousness sufficient to arouse general ill will and vindictiveness against the accused at the time of jury selection.'" *State v. Cochran*, 2000 ME 78, ¶ 21, 749 A.2d 1274, 1280 (quoting *Chesnel*, 1999 ME 120, ¶ 7, 734 A.2d at 1134-35).

■■   [¶ 16] Saucier did not request an evidentiary hearing on the motion to change venue, and none was held. The court denied the motion without prejudice. Saucier argues the court prevented him from demonstrating presumed prejudice because it did not hold a hearing on his motion. The purpose of an evidentiary hearing on a motion for change of venue is to allow the court to resolve any disputed factual issue concerning the motion. *See State v. Pritchett*, 302 A.2d 101, 103 n. 1 (Me.1973). The State does not appear to have disputed the nature or contents of the pretrial publicity. The rule governing motions for change of venue, M.R.Crim.P. 21, does not require a hearing on such mo-

tions. On the basis of what was presented to it, the Superior Court was in a position to make a determination on the motion without holding an evidentiary hearing.

[¶ 17] The newspaper articles presented by Saucier, and the radio and television broadcasts as described by Saucier in his motion, are not so extensive or invidious that they require a court to presume prejudice. As indicated above, most of the articles were straight forward accounts of the tragedy and appeared nine months before trial. Only the editorial could be considered as rhetoric or argument written to persuade, and it is directed at judges. It, along with the December news accounts, lacks immediacy.

[¶ 18] The June newspaper articles, taken together with the fact that there were also television news accounts of the failed plea agreement, do not amount to that level of saturation or invidiousness that requires a presumption of prejudice. The newspaper reports are balanced and hardly so extensive as to permeate the communities with a sense of outrage, vindictiveness, or ill will toward Saucier such that finding a truly impartial jury would be impossible. It also must be remembered that the jury was chosen from people in Cumberland County, not Androscoggin County where the Lewiston paper appears, nor York County where the Biddeford paper is published.

[¶ 19] The court did not abuse its discretion in refusing to conclude that the pretrial publicity required a presumption of prejudice. The court acted appropriately in acknowledging that Saucier could renew the motion to change venue at the time of jury selection.

2. Actual Prejudice

[¶ 20] The second situation in which a change of venue is required is that of actual prejudice, that is, when it is

demonstrated that it was not possible to select an impartial jury. *Chesnel,* 1999 ME 120, ¶ 8, 734 A.2d at 1135. The focus in determining actual prejudice is "the impartiality of the available panel members," *id.* at ¶ 6, 734 A.2d at 1134, and not whether jurors are totally ignorant of the facts and issues involved, *State v. Coty,* 229 A.2d 205, 211 (Me.1967) (citing *Irvin v. Dowd,* 366 U.S. 717, 721, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961)).

[¶ 21] As indicated above, individual voir dire of the potential jurors who said that they had been exposed to the publicity was conducted. Each juror who had formed an opinion was excused for cause. All others stated that they had not formed an opinion and would be impartial. The court was, in fact, able to select an impartial jury; the jury panel from which the jurors were chosen had not become biased because of the publicity. Saucier failed to show actual prejudice. The court did not abuse its discretion in denying the motion for change of venue.

## III. JURY INSTRUCTIONS

[¶ 22] After the jury had been deliberating for some time, it submitted a note asking the court for a "legal definition of doubt and beyond a reasonable doubt," and whether Saucier could be guilty of manslaughter "because Saucier created a situation that ultimately resulted in the death of someone." After conferring with counsel, the court recessed and then presented counsel with copies of written instructions that it intended to submit to the jury. Saucier did not object to the reasonable doubt reinstruction but he did object to the manslaughter reinstruction.

[¶ 23] When we review jury instructions, we review them "as a whole, taking into consideration the total effect

created by all the instructions and the potential for juror misunderstanding." *State v. Cote*, 462 A.2d 487, 490 (Me.1983).

## A. Reinstruction on Reasonable Doubt

[¶ 24] The court's written reinstruction on reasonable doubt provided to the jury begins with the following two sentences:

The law presumes a defendant to be innocent. Thus, a defendant, although accused, begins the trial with a "clean slate"—with no evidence against him.

[¶ 25] When the judge orally stated the reinstruction to the jury, he misspoke but immediately corrected himself. With respect to the above two sentences, he said:

And as I previously instructed you, ladies and gentlemen, the law presumes a defendant in any criminal case to be innocent. Any defendant, although accused, technically begins—or actually begins a trial with a clean slate, that is no evidence at all against him.

[¶ 26] After the court had completed the reinstruction session and the jury had been sent to resume deliberations, Saucier pointed out that the judge had used the word "technically." Saucier said the use of the word was prejudicial, but he made no request of the court. Reviewing the court's instructions on reasonable doubt as a whole, including the first time the court gave the reasonable doubt instruction, the written reinstruction, and the court's own immediate correction, we cannot find that the court's mistaken use of the word "technically" amounts to prejudicial error.

## B. Reinstruction on Manslaughter

[¶ 27] In its reinstruction on manslaughter, the court orally stated:

You may consider all of the facts in evidence to consider whether or not the State has proven these elements [of manslaughter] beyond a reasonable doubt, including conduct of the defendant while operating or not operating the vehicle. By conduct, ladies and gentlemen, what we mean are any acts done by the defendant or things that the defendant may have said.

When the jury had been instructed on manslaughter at the close of the evidence, the instruction did not contain the above language. Saucier timely objected to the reinstruction.

[¶ 28] Saucier argued that the reinstruction allowed the jury to convict him of manslaughter even if it found that he had not been driving the truck at the time it went into the river. He is correct that the jury was reinstructed that it could find Saucier guilty of manslaughter even if he had not been driving at the time of Butterfield's death. Indeed, it is not essential, in a manslaughter case involving a death in a motor vehicle accident, for the State to prove that the defendant was operating the vehicle at the time of the death. The essential elements of manslaughter are the death of a human being caused by the defendant acting recklessly or with criminal negligence. 17–A M.R.S.A. § 203(1)(A). As long as the State proved to the jury, beyond a reasonable doubt, that Saucier's conduct caused Butterfield's death and that in causing her death, Saucier's conduct was reckless, or he acted with criminal negligence, Saucier is guilty of manslaughter. If the jury concluded that Butterfield was driving the truck at the time it went into the river, it could nonetheless have found that Saucier was guilty of manslaughter as long as it concluded that he caused her death by acting recklessly or with criminal negligence.

[¶ 29] Here the instructions, taken as a whole, correctly instructed the jury that Saucier could not be convicted unless the

jury found, beyond a reasonable doubt, that Butterfield's death was caused by Saucier and that Saucier's conduct was reckless or he acted with criminal negligence. The court's reinstruction on manslaughter fairly stated the law.

■ [¶ 30] When Saucier objected to the manslaughter reinstruction, he requested that, if the instruction was given, a causation instruction be given as well. He specifically referred to the causation definition in the Criminal Code. 17-A M.R.S.A. § 33 (1983). The court agreed that it would give a "standard causation instruction," and defense counsel did not object to the causation instruction given to the jury. The court orally instructed the jury on causation as follows:

> [T]he State must prove that it was the defendant who caused the defendant's [*sic*] death. Unless otherwise provided, when causing a result is an element of a crime, as it is here, causation may be found where the result would not have occurred but for the conduct of the defendant, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient. So, in other words the State must prove to you beyond a reasonable doubt that but for the conduct of the defendant Brandi Butterfield would not be dead.

Except for the first and last sentences, this instruction is essentially the text of section 33. The court had not given the causation instruction initially.

[¶ 31] The specific objection to the causation instruction which Saucier raises now, but which he did not articulate at the trial, is that the instruction is incomplete because the court should have explained further how the causation instruction should be applied to the facts of the case. Saucier's objection is without merit.

While the court could have rephrased the causation statute in more concrete terms using the names of the defendant and the decedent, the court was not required to do so. We understand the time pressures upon a trial court which feels compelled to answer a jury's question as quickly as possible and answer it correctly. As long as the causation instruction is correct and fairly apprises the jury, we will not require the court to further amplify it.

## IV. SUFFICIENCY OF THE EVIDENCE

[¶ 32] Saucier also contends that the evidence was insufficient to convict him of manslaughter. He argues that insofar as the State was attempting to prove manslaughter, even if he was not driving at the time the truck plunged into the water, there was insufficient evidence that he caused Butterfield's death.

■ [¶ 33] On the one hand, there was evidence from which the jury could have found, beyond a reasonable doubt, that Saucier was driving at the crucial point. There was also sufficient evidence that, if Butterfield was driving, Saucier spurred her to elude the police by driving at a high speed and to crash through a gate. This evidence was in Saucier's own words, from the statement he gave to the police after the incident. Saucier's description of the chase, in addition to the other evidence concerning it, was sufficient for a jury acting rationally to conclude that Butterfield's death would not have occurred but for Saucier's conduct in prodding her to drive at a high rate of speed at night on a rough dirt road and in telling her to crash through a gate. The evidence was also sufficient to allow the jury to find, if it found that Butterfield was driving, that

Saucier's conduct in initially speeding away from the police, creating an atmosphere of anxiety and urgency, and then urging her to elude the police and drive through the gate was reckless or with criminal negligence.

The entry is:

Judgment affirmed.