2002 ME 20

**STATE of Maine**

v.

**Raymond JUNKINS.**

Supreme Judicial Court of Maine.

Submitted on Briefs: Dec. 20, 2001.
Decided: Feb. 7, 2002.

G. Steven Rowe, Attorney General, Donald W. Macomber, Asst. Atty. General, William Stokes, Asst. Atty. General, Augusta, for State.

Douglas D. Hendrick, Esq., Cornish, for defendant.

Panel: SAUFLEY, C.J., and CLIFFORD, RUDMAN, DANA, ALEXANDER, and CALKINS, JJ.

CALKINS, J.

[¶ 1] Raymond Junkins appeals from the judgment entered in the Superior Court (York County, *Fritzsche, J.*) following a jury verdict finding him guilty of five offenses: intentional or knowing murder, 17–A M.R.S.A. § 201(1)(A) (1983); attempted murder (Class A), *id.* §§ 152(1), 201(1)(A); robbery (Class A), *id.* §§ 651(1)(D), (2); theft by unauthorized taking or transfer (Class D), *id.* §§ 353, 362(1), (4)(B) (1983 & Supp.2001); and tampering with a witness (Class B), *id.* § 454(1)(A) (Supp.2001). He contends that the evidence was insufficient, the court made evidentiary errors, and the jury pool was tainted.[1] We affirm the judgment.

I. FACTS

[¶ 2] Junkins is the grandson of Verna Junkins, who was eighty eight years old when these offenses were committed. Verna was known to distrust banks and keep large sums of money in her purse in twenty-dollar bills rolled up and secured with an elastic. She would keep from $2000 to $6000 in her purse at any given time. Verna resided with a companion, Howard LaFoe, the murder victim. LaFoe, age sixty-three, was the caretaker for Verna, who was frail and suffering from dementia.

[¶ 3] On September 3, 1998, in the evening, a neighbor found Verna outside her residence. Verna was asking for help and complaining of neck pain. The neighbor escorted Verna, who walked with a shuffle, to the police station, a short distance away, where they arrived at about 8:00 P.M. A police officer spoke briefly with Verna, who appeared confused, and the officer arranged for her to be transported to the hospital. The officer then went to Verna and LaFoe's apartment where he found LaFoe's body on the kitchen floor with blood on the floor and on the body. The medical examiner later determined that LaFoe had been stabbed with a knife five

---

1. Junkins' appellate counsel first filed an *Anders* brief and requested leave to withdraw. In *State v. Junkins,* 2001 ME 133, 779 A.2d 948, we denied the motion to withdraw and ordered counsel to fully address the issues that he had previously identified. Junkins' counsel and the State have submitted briefs addressing the four identified issues on appeal.

times. Three of the wounds were superficial, but the stab wounds to the neck had caused LaFoe's death. The wounds were consistent with a knife the police found in the kitchen.

[¶ 4] Verna was examined at the hospital. She had grip marks on her neck consistent with being choked or smothered. The police interviewed Verna several times that evening, both at the hospital and at her daughter's home. Neither Verna's purse nor LaFoe's wallet was ever found.

[¶ 5] On the day that LaFoe was killed, Junkins owed $1480 to a friend for rent and for interest on bail money that the friend had posted. Junkins had been charged with the crime of escape in the State of New Hampshire and released on bail. The friend had asked Junkins for the money on several occasions, and on the day of the murder she told Junkins that she would turn him in to New Hampshire officials, which would result in his incarceration pending trial, unless he paid the debt immediately. Junkins promised he would pay the sum that day. At about 9:00 that evening Junkins went to the friend's home and paid her in full, all in twenty-dollar bills.

[¶ 6] The next day Junkins asked his ex-wife to give him a ride to Bow, New Hampshire. During the ride, he asked his ex-wife to say that he had been with her the night before, "[e]ven if it meant someone coming to you saying that they were investigating a murder." After hesitating, the ex-wife agreed she would say he had been with her. Junkins asked her to stop at a store where he purchased a new pair of boots, and in another store he bought pants and a baseball cap. He put the new clothes on in the car and placed his old clothes in one of the shopping bags. He had brought a black plastic garbage bag with him when he met his ex wife, and he asked her to dispose of the garbage bag

and the shopping bags in Concord, New Hampshire, which she did.

[¶ 7] In the meantime Junkins' girlfriend, with whom he resided, had become suspicious. Junkins was gone for about three hours on the evening that LaFoe was killed. He returned home at 8:30, but left again briefly. When he came back he took off his shirt, put it in the hamper and told his girlfriend there was blood on it. He threw money onto the bed. The girlfriend asked where the money came from, and Junkins said he stole it. He then left, saying that he was going to pay the friend.

[¶ 8] The next day when the girlfriend came home from work, she looked in the hamper for the shirt, but it was gone. The day after that, while at her mother's house, the girlfriend learned that LaFoe had been killed. The girlfriend told her mother about Junkins' behavior and the money. The mother called the police, and Junkins was arrested later that day. When questioned by the police, the ex-wife stated that he had been with her on the evening of LaFoe's murder. Later, when confronted with the time records from her place of employment, she admitted she had been working that night.

[¶ 9] Junkins was incarcerated pending the trial. While in jail he met Anthony Dorothy, a federal prisoner awaiting sentencing. Dorothy testified that Junkins admitted to him that he killed LaFoe after an argument.

[¶ 10] Junkins testified at trial and denied killing LaFoe and committing the other crimes. He testified that he received $800 in twenty-dollar bills from his employer, a painting contractor, in August and still had those twenty-dollar bills on September 3. He claimed that on the evening of September 3 he went first to his employer's home in East Wakefield and then to Rochester, New Hampshire, where he sold marijuana to an acquaintance for

$800 in twenty-dollar bills. Junkins claimed that aspects of the testimony of his girlfriend and his ex wife were lies.

[¶ 11] The jury convicted Junkins on all five charges. He was sentenced to forty years incarceration on the murder charge and to lesser concurrent periods of incarceration on the other charges.

## II. DISCUSSION

### A. Sufficiency of the Evidence

[¶ 12] When the defendant claims that the evidence was insufficient to support a conviction, we review the evidence in the light most favorable to the jury's verdict to determine if the factfinder, acting rationally, could find every element of the offenses beyond a reasonable doubt. *State v. Parsons,* 2001 ME 85, ¶ 6, 773 A.2d 1034, 1036. A conviction can be based on circumstantial evidence. *State v. Dill,* 2001 ME 150, ¶ 13, 783 A.2d 646, 651.

[¶ 13] The circumstantial evidence that Junkins caused the death of LaFoe by intentionally stabbing him is overwhelming, as is the evidence that he attempted to murder Verna Junkins by choking her. The evidence amply proves that Junkins murdered LaFoe and tried to murder Verna during a robbery from which he obtained a substantial amount of cash in twenty-dollar bills. In addition, there was sufficient evidence for the jury to find that, knowing that an official investigation was to be instigated, Junkins induced his ex-wife to lie to the police as to his whereabouts on the night of the murder. There is no merit to Junkins' sufficiency of the evidence challenge.

### B. Exclusion of Verna's Statements to the Police

[¶ 14] Verna made statements to the police during four videotaped interviews totalling six hours in length. The State and Junkins' trial counsel agreed that Verna, because of her health, was an unavailable witness for purposes of M.R. Evid. 804(a). The trial court had reviewed the tapes of the interviews, read the transcripts made from those tapes, and found that in response to leading and persistent questioning by the police Verna gave inconsistent answers. The court found that the tapes demonstrated that Verna was suffering from the effects of advanced age and dementia. It concluded that although there was some suggestion in the interviews that Verna admitted killing LaFoe, possibly in self-defense, her statements were not reliable, and the attendant circumstances did not indicate trustworthiness. The court found that Verna's confused and jumbled statements amounted to little more than that she had been present when some altercation took place, that LaFoe and maybe a third person were present, and that she got hurt and ran outside. On the basis of the record before us, we cannot say that the trial court abused its discretion in refusing to admit the videotapes as statements against interest pursuant to Rule 804(b)(3). The court's finding that Verna's statements to the police contained in the videotapes were untrustworthy is supported by the record and is not clearly erroneous.

[¶ 15] On the fifth day of trial Junkins requested that the tapes of Verna's interviews be admitted to impeach one of the State's witnesses, Anthony Dorothy. Dorothy testified that Junkins admitted that he had killed LaFoe after an argument and that he put the knife in his grandmother's hands telling her repeatedly that she had hit LaFoe with the knife.

[¶ 16] Junkins requested that the court allow the videotapes of Verna's interviews by the police to be shown to the jury for the purpose of impeaching Dorothy's testimony. Counsel asserted that anyone who saw the videotapes would see that Verna was not susceptible to suggestions that she

had killed LaFoe and that Junkins, who had read the transcripts, never would have told Dorothy what he did. The court ruled that the videotapes were not admissible to impeach Dorothy because they would take six hours of the jury's time, and it was difficult to understand how the videotapes would impeach Dorothy's testimony.

[¶ 17] The court did not abuse its discretion in refusing to admit the videotapes. Having the jury review six hours of interviews of a witness suffering from dementia would have been a waste of time given the dubious proposition that the tapes would tend to impeach Dorothy's testimony. *See* M.R. Evid. 403. The rationale as to how the tapes would impeach Dorothy was twisting and tortuous,[2] at best, and because it did not appear that impeachment could possibly be the result, it was within the court's discretion to disallow the tapes.

## C. Evidence of Charge Pending Against Junkins in New Hampshire

▬ [¶ 18] The State's theory was that Junkins' motive for the robbery was to obtain money to pay the friend who had posted bail in Junkins' criminal case in New Hampshire so that the friend would not revoke the bail and cause Junkins to be incarcerated. Thus, the State indicated to the court that it would be offering evidence that Junkins had been charged in New Hampshire and was out on bail at the time of LaFoe's murder. The trial court allowed the evidence but instructed the prosecutor that he was not to give the specifics of the New Hampshire offense and to refer to it as a nonviolent offense. The court gave a limiting instruction to the jury that the exact nature of the New

Hampshire charge was of no consequence and that the jurors were not to use the fact for any purpose except motive. The probative value of this motive evidence sufficiently outweighed any danger of unfair prejudice, particularly given the court's instruction. The court did not abuse its discretion in allowing the evidence.

## D. Tainted Jury Pool

▬ [¶ 19] The final issue concerns whether the jury pool was tainted by the remarks of Juror # 60, who had said to Juror # 10, in church the day before jury selection, that Junkins was guilty, and who was overheard by other potential jurors the morning of jury selection to say that Junkins was "guilty as sin." Juror # 60 had been excused before jury selection began for another reason. Through thorough questioning of the pool and individual jurors the court eventually concluded that five members of the jury pool had overheard Juror # 60 make the remarks. Juror # 10 and all other members of the jury pool who had overheard the "guilty as sin" statement were excused for cause.

[¶ 20] Junkins now argues that the entire venire was tainted by the remark of Juror # 60, and that in spite of questioning jurors and excusing all those who responded that they overheard the remark, the court could not be absolutely certain that others had not heard the statement. Junkins argues that the court should have dismissed the entire pool although he did not request that remedy from the trial court and did not object to the seating of the jury as chosen.

---

2. The unstated but possibly inferential rationale was as follows: Verna did not confess to the police that she had killed LaFoe even though the police seemed to try to get her to confess; therefore, the tapes demonstrate that she was not susceptible to suggestions; Junkins knew that his grandmother was resolute

and not gullible; Junkins had read the transcripts of the interviews; Junkins would never have intimated that his grandmother was suggestible; therefore, Dorothy had to be lying when he testified about the conversation with Junkins.

[¶ 21] We cannot presume, from the sole fact that Juror # 60 made the "guilty as sin" remark, that Junkins was prejudiced. This is not similar to a situation in which we will presume prejudice because pretrial publicity has been so immediate, intense, or invidious as to arouse ill will or vindictiveness toward the defendant. *See State v. Saucier,* 2001 ME 107, ¶ 15, 776 A.2d 621, 626. Because there can be no presumption of prejudice in this case, Junkins must demonstrate that he suffered actual prejudice from Juror # 60's statement. *See State v. Corson,* 572 A.2d 483, 485 (Me.1990). He has not made this demonstration. When pretrial publicity is at issue, a court determines actual prejudice based on the impartiality of the panel from which the jury members are chosen. *Saucier,* 2001 ME 107, ¶ 20, 776 A.2d at 627. Here all of the jurors who had overheard the "guilty as sin" remark were excused before the clerk began the process of drawing numbers. The available panel did not include any person who had overheard Juror # 60's statement. Junkins has failed to establish any error by the court in the jury selection process.[3]

The entry is:

Judgment affirmed.

---

3. Junkins has also suggested that pretrial publicity may have tainted the jury pool. He has made no showing, however, as to the extent of any pretrial publicity or that he suffered any actual prejudice from potential jurors having been exposed to such publicity. The trial court carefully asked the entire jury pool whether they had seen or heard anything about the case. The court then interviewed individually all members of the pool who responded affirmatively. All those who had heard or seen publicity concerning the case were asked to describe that publicity; whether they had discussed the publicity with anyone; whether they had formed an opinion about the guilt or innocence of Junkins; and whether the publicity had in any way affected their feelings or viewpoint about the case. Depending upon the answer, the court asked follow-up questions and gave the prosecutor and Junkins' counsel the opportunity to ask additional questions. Jurors who responded that the pretrial publicity had an effect on them or who were not certain that the publicity did not affect them were excused for cause.