MAINE SUPREME JUDICIAL COURT                     Reporter of Decisions
Decision:      2024 ME 67
Docket:        Pen-23-376
Argued:        May 7, 2024
Decided:       August 20, 2024


Panel:         STANFILL, C.J., and MEAD, HORTON, CONNORS, LAWRENCE, and DOUGLAS, JJ.


STATE OF MAINE

v.

RONALD A. HARDING


CONNORS, J.

[¶1]   Ronald A. Harding appeals from a judgment of conviction for manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2024), entered by the trial court (Penobscot County, *A. Murray, J.*) after a jury trial.  Harding argues that the State failed to present sufficient evidence to support the conviction and committed prosecutorial error in its closing argument.  We affirm the judgment.

## I.  BACKGROUND

[¶2]  We recite the evidence in the light most favorable to the verdict. *See State v. Hansen*, 2020 ME 43, ¶ 2, 228 A.3d 1082.

## A.    The Event

[¶3]  In May 2021, Harding lived with his girlfriend, her three children, and their infant son.  On the evening of May 31, 2021, Harding, his girlfriend,

2

and the four children returned to their home in Brewer around 6:00 p.m. Harding's girlfriend passed their infant son to him so she could get the other three children ready for bed. When Harding took his infant son from his girlfriend, the infant was acting normally. While Harding was holding him, the infant became unresponsive and did not regain consciousness or breathe on his own again. Medical examinations revealed an abrasion on the back of the infant's head with an associated subgaleal hemorrhage and further diffuse brain injury with multiple hemorrhages that were consistent with non-accidental trauma, resulting in a fatal brain herniation. The victim's symptoms had immediate onset and resulted from shaken impact syndrome, which is caused by combined rotational and acceleration/deceleration forces on the brain inside of the skull, otherwise known as a shearing injury.

## B. The Evidence at Trial

[¶4] On June 4, 2021, Harding was arrested and charged by complaint with manslaughter. A condition of Harding's bail was that he have no contact with his girlfriend.[1] On June 30, 2021, a grand jury indicted Harding on one count of manslaughter (Class A), 17-A M.R.S. § 203(1)(A).

---

[1] Harding later admitted that while he was on bail, he sent an email to his girlfriend, which read, "Did you or the kids cause this because I think it's fucked up. I went out for a cigarette and find him like he was in his dome." This was the first time that Harding had mentioned to his girlfriend that he

[¶5]   The State presented its case to the jury over four days in late February and early March 2023.  The State's case consisted of testimony and exhibits from thirteen witnesses, including medical professionals who treated the victim, the medical examiner who performed the autopsy, and the State's consulting neuropathologist, Dr. Elizabeth Bundock.  In addition to recalling a detective and Dr. Bundock, the defense presented the testimony of Dr. Jane Turner, a consulting forensic pathologist.

[¶6]   The State's presentation included evidence of the healthy state of the victim up until Harding's time alone with him, immediately followed by the victim's critical condition; the testimony of the treating medical professionals, the deputy chief medical examiner, and Dr. Bundock that the cause of death was a traumatic head injury; and the testimony of the treating professionals and medical examiner that the injury occurred on May 31.  The defense's position was that death could have been caused not by a brain injury inflicted by Harding on May 31, but by COVID as opined by Dr. Turner, or an injury occurring before May 31, a theory based on aspects of Dr. Bundock's testimony.

---

had left the victim unsupervised.  Harding's bail was subsequently revoked because of the violation of the no-contact condition.

4

## C.     The State's Closing

[¶7]  Harding moved for a judgment of acquittal after the State rested, renewing the motion following the close of evidence.  The trial court denied the motion at both stages, noting that it was the jury's role to determine which witness's testimony to believe.

[¶8]  During its closing, the State argued that Harding "hired an expert to say this was not inflicted trauma" but was COVID.  Contrasting such an expert with medical professionals testifying for the State, the prosecutor said, "It wasn't the job of these medical professionals to come in to court and give opinions supporting one side or the other, to search the internet and cherry[-]pick for information to try to come up with some"—at which point defense counsel objected.

[¶9]  At the sidebar held immediately thereafter, defense counsel argued that the State was improperly minimizing Dr. Turner's credibility based on her being hired.  After having the argument read back, the court said it was not sure whether it agreed with the defense but asked what defense counsel would like the court to do in response if it agreed with defense counsel's position. Defense counsel answered, "A curative instruction that would indicate that you can take no inference from whether an expert is presented by one side or the other."  The

court agreed that it would give such an instruction with its standard jury instructions, to which defense counsel responded, "Very good." After closing arguments, defense counsel withdrew his request for the curative instruction, so it was not given.[2]

### D. The Jury's Deliberations and the Judgment

[¶10] After the jury retired to deliberate, it requested a readback of the deputy chief medical examiner's testimony referencing spinal fluid clarity.[3]

[¶11] The jury returned a guilty verdict a little more than an hour after beginning deliberations. Harding then renewed his motion for a judgment of acquittal and made a motion for a judgment notwithstanding the verdict, and the court denied both motions. The court entered its judgment of conviction on September 19, 2023, and Harding timely appealed.[4] *See* M.R. App. P. 2B(b); 15 M.R.S. § 2115 (2024).

---

[2] After a review of the proposed jury instructions, the trial court confirmed that defense counsel was "withdrawing his request for a curative instruction that he . . . requested during the state's closing," to which defense counsel answered, "Yes, Your Honor."

[3] Dr. Turner had opined that the victim's death was caused by COVID based in part on an understanding that the victim's spinal fluid was cloudy at the time of autopsy, which could indicate infection. The deputy chief medical examiner testified that the fluid had been bloody, not cloudy, "so [he] was not concerned about any kind of infection in the central nervous system."

[4] Harding received a fifteen-year sentence, with all but eight and a half years suspended, and six years of probation.

## II. DISCUSSION

[¶12]  Harding asserts two arguments on appeal: (A) the evidence was insufficient to support the conviction and (B) the State committed reversible prosecutorial error in its closing by implying that the defense hired its expert for cherry-picked testimony while vouching for the State's medical witnesses.

## A.    Sufficient evidence supports the manslaughter conviction.

[¶13]  "When the defendant claims that the evidence was insufficient to support a conviction, we review the evidence in the light most favorable to the jury's verdict to determine if the factfinder, acting rationally, could find every element of the offense[] beyond a reasonable doubt."  *State v. Junkins*, 2002 ME 20, ¶ 12, 789 A.2d 1266.  In doing so, we resolve any conflicts in the evidence in favor of the verdict, *see State v. Mazerolle*, 614 A.2d 68, 74 (Me. 1992), with the understanding that "[t]he weight to be given to the evidence and the determination of witness credibility are the exclusive province of the jury." *State v. Basu*, 2005 ME 74, ¶ 20, 875 A.2d 686 (quotation marks omitted). "[T]he fact-finder is free to selectively accept or reject testimony presented based on the credibility of the witness or the internal cogency of the content." *State v. Williams*, 2012 ME 63, ¶ 49, 52 A.3d 911 (quotation marks omitted). After carefully reviewing the evidence presented, we conclude that the jury

could have rationally found each element of the crime of manslaughter beyond a reasonable doubt.

[¶14]  To convict a person of manslaughter, the State must prove that the defendant "[r]ecklessly, or with criminal negligence, cause[d] the death of another human being."  17-A M.R.S. § 203(1)(A).  A defendant acts with criminal negligence "when [he] fails to be aware of a risk that [his] conduct will cause such a result."  17-A M.R.S. § 35(4)(A) (2024).[5]  The defendant's failure to be aware of the risk "must involve a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation." 17-A M.R.S. § 35(4)(C).  The fact-finder may find the applicable mens rea "based solely on circumstantial evidence."  *State v. Brown*, 2017 ME 59, ¶ 9, 158 A.3d 501.

[¶15]  Harding claims that the evidence was insufficient to prove that he inflicted a traumatic brain injury causing the victim's death.  Although he includes Dr. Turner's COVID opinion in his recitation of the facts, his legal argument to us focuses on the contention that the evidence indicated that the

---

[5]  The definition of "recklessly" focuses on the conscious disregard of a risk, result, or circumstance, plus "a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation."  17-A M.R.S. § 35(3)(A)-(C) (2024).  The definition of criminal negligence focuses on failure to be aware of a risk and "a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation."  *Id.* § 35(4)(A)-(C).

8

victim was "already experiencing bleeding and clotting within his brain before the time when defendant supposedly injured him." This contention is based on aspects of Dr. Bundock's testimony.

[¶16] The short answer to Harding's argument is that when the evidence is sufficient to support different outcomes, it is the jury's role to evaluate the evidence. *State v. Gove*, 379 A.2d 152, 153 (Me. 1977) (We do "not substitute [our] judgment for that of the jury in resolving the credibility of the various witnesses and the weight to be given their testimony.") The jury was free to reject any suggestions by Dr. Bundock or any other witness regarding the timing of the injury and to accept other evidence indicating that a traumatic brain injury occurred on May 31 while the victim was in Harding's sole care, including:

- Harding's girlfriend's testimony that after returning home on May 31, 2021, she handed the victim to Harding and "[h]e was awake. He was smiling and . . . he was just a normal baby";

- The testimony of the victim's pediatric critical care physician, based on many tests and consultations, that the victim's injury resulted from a non-accidental trauma;[6]

- A CT scan revealing multiple brain bleeds, loss of grey-white differentiation, i.e., swelling, and brain herniation down through the base of the skull;

---

[6] The critical care physician confirmed the victim's death by conducting two neurological criteria exams.

- The testimony of the consulting neurosurgeon that he reviewed the imaging of the victim's brain and, based on the victim's presentation, there was no surgical intervention that he could offer, and based on the victim's health history, available information, and the imaging taken at the hospital, the victim had a very severe brain injury that resulted from "a terrible trauma" that would have rendered the victim "unresponsive *almost immediately*" (emphasis added);

- The testimony of an ophthalmologist that there was extensive retinal hemorrhaging in a pattern indicative of abusive head trauma;

- The testimony of a pediatric neurologist that she conducted a head CT scan on the victim and found subdural, subarachnoid, and petechial intraparenchymal hemorrhages; that a usual mechanism for these types of injuries is often closed head trauma, i.e., rotational or acceleration and deceleration forces within the skull; and that lab tests "did not show an alternative concerning cause for him to be unresponsive and comatose in the way that he was";

- The testimony of a detective recounting her interview with Harding, which the State played for the jury, where Harding confirmed that he was holding the victim when the victim went limp; and

- The testimony of the deputy chief medical examiner that he found an abrasion on the back of the victim's head with a related subgaleal hemorrhage and subdural and subarachnoid hemorrhages, from which the bleeding caused global encephalomalacia—a type of swelling that resulted in fatal brain herniation and that, relevant to timing, the blood located during the autopsy was bright red, indicating an acute hemorrhage, i.e., occurring "*at or about the time of death or within that day*." (Emphasis added.)

[¶17]  It is the fact-finder's prerogative "to resolve conflicting issues of fact, and thus [w]e defer to all credibility determinations made by the fact-finder." *State v. Saenz*, 2016 ME 159, ¶ 22, 150 A.3d 331 (quotation marks

omitted). Because there is ample evidence in the record to support the jury's verdict, we affirm the judgment.[7]

**B. Harding's prosecutorial error argument was waived.**

[¶18]  Harding argues that the prosecutor's statements that Harding "hired an expert to say this was not inflicted trauma" and that it "wasn't the job of these medical professionals to come in to court and give opinions supporting one side or the other, to search the internet and cherry[-]pick for information" amounted to accusing the defense of suborning perjury while simultaneously and improperly vouching for the credibility of its witnesses.

[¶19]  The threshold issue we confront in addressing this argument is whether it was waived. Following the prosecutor's comment that the defense's expert's opinion was based on "cherry-picked" information, defense counsel objected. The remedy he sought and obtained was not a mistrial but a curative instruction, which the court said it would provide, using language that defense

---

7  Although it would not have mattered had Dr. Bundock flatly opined that the injury occurred prior to May 31 because the jury would have been free to reject such an opinion, we note that Dr. Bundock's testimony as to the timing of the injury was equivocal. She testified that she observed hemosiderin that "is typically thought to take a couple of days before it appears," but that her conclusion was based on studies primarily involving adult autopsies, and she acknowledged that "infants in many aspects can heal faster," agreeing that it is "hard to make the call with respect to the . . . aging of infant injuries." She further qualified her answer by noting that the hemosiderin that she observed could have represented bleeding even from the victim's birth. She also noted that she would not have seen the blood observed by the medical examiner indicating a recent bleeding event because that blood would have been washed away by the time the brain was sent to her for examination.

counsel approved. Defense counsel subsequently told the court that he was withdrawing his request for the curative instruction.

[¶20] Harding concedes that the failure to request a mistrial would mean that the obvious error standard of review applies, and argues for its application here. *Cf. State v. Quirion*, 2000 ME 103, ¶ 25, 752 A.2d 170 ("When a defendant objects to statements made by a prosecutor during closing argument and the court issues a curative instruction, the defendant must make a further objection or move for a mistrial to preserve the issue for appeal."); *State v. Jones*, 580 A.2d 161, 163 (Me. 1990).

[¶21] Here, however, the lack of a request for a mistrial was coupled with an affirmative withdrawal of a request for a curative instruction, which was the remedy defense counsel initially sought and then decided should be omitted. These choices were conscious, amounting to waiver. *See State v. Scott*, 2019 ME 105, ¶ 20, 211 A.3d 205 ("By expressly declining a curative instruction for strategic reasons and not otherwise moving for a mistrial, Scott failed to preserve for appellate review the admissibility of the homeowner's statement or any potential prejudice flowing therefrom."); *State v. Rega*, 2005 ME 5, ¶ 17, 863 A.2d 917 (withdrawing an objection precludes review; "[w]hen a party affirmatively agrees to a court action, that party has failed to

preserve the action for appellate review"); *State v. Cardilli*, 2021 ME 31, ¶ 33, 254 A.3d 415 ("If a defendant explicitly waives the delivery of an instruction or makes a strategic or tactical decision not to request it, we will decline to engage in appellate review, even for obvious error." (quoting *State v. Nobles*, 2018 ME 26, ¶ 34, 179 A.3d 910)).

[¶22]  We understand the difficult position that defense counsel can confront when something objectionable is said.  Counsel needs to preserve an objection but may also not want to bring more attention to the objectionable statement by seeking a curative instruction.  But here, the curative instruction would have been given with the other standard jury instructions; there is nothing about the language of that curative instruction that would highlight any objectionable statement; defense counsel never asked for a mistrial; and, importantly, the sequence of events regarding his objection makes clear that his decision to forgo his objection was conscious.[8]  For all these reasons, the

---

[8]  A benefit lost by a failure to object at the trial level is the trial court's real-time assessment of the situation and of any potential prejudice from the allegedly objectionable statement.  *See infra* n.9. In the absence of this benefit, we evaluate an objection raised for the first time on appeal under a limited obvious error standard when an error is so patent and clearly prejudicial that, in theory, the trial court should have rectified the error sua sponte.  *See State v. Haji-Hassan*, 2018 ME 42, ¶ 18, 182 A.3d 145.  But when the trial court has responded to an objection in the manner expressly sought by defense counsel, we defer to defense counsel's strategic choice of the appropriate response; in an adversarial system, as opposed to an inquisitorial system, an affirmative decision that is not a mere omission is respected under the party-presentation principle.  *See State v. Whitney*, 2024 ME 49, ¶ 18, --- A.3d --- (noting our respect for the policy of party presentation); Jeffrey M. Anderson, *The Principle of Party Presentation*, 70 Buff. L. Rev. 1029, 1101-02 (2022) (discussing the limited ability to review forfeited but not waived errors under Federal Rule of Criminal Procedure 52(b)).

argument on appeal that a mistrial is warranted based on the prosecutor's statements made during her closing was waived and not subject to appellate review.[9]

[¶23]   For all these reasons, the evidence supporting the verdict was more than sufficient, and Harding's prosecutorial error argument was waived. We affirm the judgment.

The entry is:

> Judgment affirmed.

---

[9] Even if the argument were not waived, the argument would not succeed under an obvious error standard of review. For Harding to demonstrate obvious error, he must show "(1) an error, (2) that is plain, and (3) that affects substantial rights. [I]f these three conditions are met, we will set aside a jury's verdict only if we conclude that (4) the error seriously affects the fairness and integrity or public reputation of judicial proceedings." *State v. Wai Chan*, 2020 ME 91, ¶ 23, 236 A.3d 471 (citation and quotation marks omitted); M.R.U. Crim. P. 52(b). A prosecutor commits no error by pointing out (if supported in the record) that an expert for the defense is being paid a consulting fee for services on the case while witnesses supporting the State's case are earning only salaries that are unrelated to their work on the case. Payment can be a legitimate factor to explore for motive and bias. *See Werner v. Lane*, 393 A.2d 1329, 1338 (Me. 1978) ("[R]emunerative arrangements between parties and their expert witnesses is legitimate subject matter for comment to the jury. . . ."). Error arises when a prosecutor asserts that a defense expert is lying *because* the expert is being paid a fee, uses denigrating language like "hired gun," or personally vouches that other witnesses not being paid a fee are telling the truth. *See generally United States v. Mullins*, 446 F.3d 750, 762 (8th Cir. 2006). There was no prosecutorial statement that opinions from all hired experts are suspect; indeed, the State presented its own consultant's testimony. Similarly, the prosecutor's reference to searching the internet and cherry-picking, while awkwardly phrased, when put in context, highlighted the State's argument that the treating medical professionals were on-site at the time of crisis and focused on treatment to save the victim's life, and thus had a better understanding of what actually happened and why. Finally, the court mitigated any potential prejudice by instructing the jury that the opening statements of the attorneys and the closing arguments of the attorneys are not evidence and that expert testimony is to be evaluated as is any other evidence.

Rory A. McNamara, Esq. (orally), Drake Law LLC, York, for appellant Ronald A. Harding

Aaron M. Frey, Attorney General, and Leanne Robbin, Asst. Atty. Gen. (orally), Office of the Attorney General, Augusta, for appellee State of Maine

Penobscot County Unified Criminal Docket docket number CR-2021-1628
FOR CLERK REFERENCE ONLY