MAINE SUPREME JUDICIAL COURT                           Reporter of Decisions
Decision:     2015 ME 124
Docket:       Oxf-14-439
Argued:       June 17, 2015
Decided:      September 3, 2015

Panel:        SAUFLEY, C.J., and ALEXANDER, MEAD, GORMAN, JABAR, and HJELM, JJ.

# STATE OF MAINE

v.

# KRISTINA I. LOWE

HJELM, J.

[¶1] Kristina I. Lowe appeals from a judgment of conviction for two counts of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2014), and aggravated leaving the scene of a motor vehicle accident (Class C), 29-A M.R.S. § 2252(5) (2014), entered by the trial court (Oxford County, *Clifford, J.*) after a jury trial. Lowe contends that the court erred in the following ways, among others: denying her motion for a change of venue due to pre-trial publicity; denying her motion for a mistrial after her father, Earl Lowe, testified about statements that she made in the hospital following the accident; and allowing expert testimony regarding the presence of THC metabolites in a sample of her blood. Lowe also contends that the evidence was insufficient to support her convictions.[1] Because we find no

---

[1] Additionally, Lowe argues that the court erred by allowing the State to present allegedly false testimony and by failing, sua sponte, to sever the manslaughter and operating under the influence charges

judicial error and conclude that the evidence presented to the jury was sufficient to support Lowe's convictions, we affirm the judgment.

## I. BACKGROUND

A. The Events of January 6-7, 2012

[¶2] "Viewing the facts in the light most favorable to the State, the jury could have found the following facts beyond a reasonable doubt." *State v. Brockelbank*, 2011 ME 118, ¶ 2, 33 A.3d 925. Shortly after midnight on January 7, 2012, Lowe was driving a car with three passengers on Route 219 in West Paris when the car went off the road and crashed, killing two of the passengers: sixteen-year-old Rebecca Mason and nineteen-year-old Logan Dam. Lowe, who was eighteen years old at the time, and the other passenger in the vehicle, twenty-two-year-old Jacob Skaff, survived the crash but suffered serious injuries.

[¶3] At the time of the crash, the group was returning to a party at a residence in West Paris. Attendees of the party observed that earlier in the night, Lowe appeared drunk and was drinking from a bottle of Jagermeister liquor. Lowe told one of the EMTs who treated her that she had consumed two shots of liquor at the party, and Lowe told a state trooper after the accident that she had consumed

for trial, which she claims the court should have done because of the jury's eventual acquittal of Lowe on the operating under the influence charge. These contentions are not persuasive, and we do not discuss them further.

five shots of liquor. Lowe also repeatedly stated after the accident that she was not the driver because she had been drinking. During the party, Lowe drove a borrowed car in circles in the driveway of the residence, eventually hitting a tree stump, after which she came back into the residence laughing, prompting one of the residents to take away her keys. In addition, a witness saw Lowe "smoking a joint with another guy" in a car.

[¶4] Not long before midnight, Lowe left the party with Dam and Skaff to pick up Mason. After picking her up, they stopped at a convenience store to get gas and purchase alcohol, and they then proceeded on Route 219 toward the party with Lowe driving. The portion of Route 219 where the crash occurred was straight and the speed limit was fifty miles per hour, but expert testimony at trial established that Lowe's vehicle was traveling at as much as seventy-five miles per hour. A forensic meteorologist testified that, given the weather conditions that night, there could have been black ice on the road, and one EMT who responded to the accident stated that the road was "a little slippery." However, a state trooper who responded to the accident observed that, although there "was moisture on the roadway from a recent storm," the road had recently been treated with salt and sand and the travel portion of the roadway was clear. Other police officers and first responders did not notice any dangerous road conditions on Route 219 that night.

4

[¶5]  At 12:11 a.m., a text message came into Lowe's cell phone.  According to Lowe, she looked down at the phone to see whom the text message was from, Dam grabbed the wheel from the backseat, and Lowe then lost control of the car. The car flew through the air, hitting several trees before landing.  Lowe and Skaff suffered serious injuries, including broken backs, but were able to climb out of the vehicle.  Dam and Mason were killed by blunt force trauma, and Skaff later testified that he believed they were dead when he and Lowe left the vehicle. Neither he nor Lowe could find their phones, and Lowe lost a shoe.

[¶6]  Without stopping at any houses closer to the scene of the crash, Lowe and Skaff walked roughly a mile back to the site of the party to report what had happened.  When they arrived, they were covered in blood and appeared shaken and badly injured, and Lowe stated that she was "pretty sure people are dead." Lowe was helped into a bedroom and onto a bed, and someone at the party called 911, even though Lowe stated, "I am not going to jail" and that she did not want anyone to call the police.  Skaff "took off running" after the police were called, and Lowe unsuccessfully tried to get someone to take her away before the police arrived.

[¶7]  Emergency medical personnel arrived at the residence, and Lowe was taken to Stephens Memorial Hospital in Norway.  She was then transferred for further treatment to Maine Medical Center, where she was interviewed by

Maine State Police Detective Lauren Edstrom. In that interview, Lowe initially denied that she had been driving, stating that Skaff was the driver and that she would not have been driving because she had been drinking. Later in the interview, she admitted that she had been driving and stated that Dam had reached from the backseat and grabbed the wheel. She also asked repeatedly about the condition of Dam and Mason, and was eventually told that they had not survived.[2]

B.    Pre-trial Procedure

[¶8]    In June 2012, Lowe was charged by indictment with two counts of manslaughter (Class A), 17-A M.R.S. § 203(1)(A); two counts of aggravated operating under the influence (Class B), 29-A M.R.S. § 2411 (1-A)(D)(1-A) (2014); and one count of aggravated leaving the scene of a motor vehicle accident (Class C), 29-A M.R.S. § 2252(5).[3] At arraignment, she pleaded not guilty.

[¶9]    Before trial, Lowe filed four motions in limine, one of which requested the exclusion of evidence "pertaining to Defendant's impairment, operation under the influence, [and] use of alcohol or drugs." Lowe also filed a motion for change

---

[2]    On October 31, 2013, we affirmed the trial court's order suppressing an additional portion of the interview due to Edstrom's failure to give *Miranda* warnings to Lowe. *See State v. Lowe*, 2013 ME 92, ¶¶ 11, 19, 26, 81 A.3d 360.

[3]    Although neither the OUI statute, 29-A M.R.S. § 2411 (1-A)(D)(1-A), nor the leaving the scene statute, 29-A M.R.S. § 2252(5), uses the term "aggravated" to describe that particular crime, we have done so in the past, *see, e.g.*, *State v. Caron*, 2011 ME 9, ¶ 1, 10 A.3d 739 (aggravated OUI); *State v. Cheney*, 2012 ME 119, ¶ 1, 55 A.3d 473 (aggravated leaving the scene), and for convenience we do so here as well.

6

of venue because of pretrial publicity. After a hearing, the court denied all of the motions in limine and denied the motion for a change in venue without prejudice.

C.    The Trial

[¶10]   A jury trial was held over six days in May 2014. In addition to eliciting the facts described above, the State presented the following testimony that bears on the issues raised in this appeal. State Trooper Adam Fillebrown testified that he searched the house where the party was held and found, among other things, a jacket with marijuana in the pocket, which one of the witnesses from the party later identified as the jacket that Lowe had been wearing. Fillebrown also searched the vehicle and found unopened cans of Four Loko, which is an alcoholic energy drink, an unopened bottle of Jagermeister liquor, and a marijuana pipe. A State Police detective also found Lowe's phone, which had been ejected from the vehicle in the crash.

[¶11]   Andrea Donovan, a computer forensic analyst for the Maine State Police Computer Crimes Unit, testified that she analyzed Lowe's cell phone and determined that a text message came into Lowe's phone at 12:11 a.m., but she could not tell whether the message had been read. She found no evidence of any text messages composed or sent from the phone around the time of the crash.

[¶12]   A nurse from Stephens Memorial Hospital testified that she drew blood from Lowe a few hours after the crash, and a chemist from the Department

of Health and Human Services Environmental Testing Lab testified that he analyzed the sample and determined that at the time it was drawn Lowe's blood alcohol content was .04%. He testified that he sent the sample to an out-of-state laboratory, and the chemist from that laboratory, Dr. Edward Barbieri, testified that Lowe's blood sample tested positive for both active THC, the psychoactive ingredient in marijuana, and an inactive metabolite of THC that is produced by the body after consuming marijuana. He also testified that it could not be determined from those results whether Lowe was impaired by marijuana at the time of the crash. Prior to Barbieri's testimony, Lowe objected to the admission of evidence of THC in her blood, arguing that it should be excluded pursuant to M.R. Evid. 401 and 403. The court overruled her objection.

[¶13] The State also played the unsuppressed portion of the recording of Lowe's interview at the hospital and presented the testimony, described above, of party attendees who witnessed Lowe's behavior before the crash and the events that occurred when Lowe returned after the crash. When the State rested, it reserved the right to call Lowe's father, Earl Lowe, as a witness if he could be located and brought to court. The State had served Earl with a subpoena for trial, but he did not appear as directed. Lowe did not object when the State indicated that it was resting its case-in-chief "conditionally" upon Earl's appearance.

[¶14]   After being arrested for failure to appear pursuant to the subpoena, Earl was brought into court on the fifth day of the trial, and the State was permitted to question him, thereby interrupting the defense's presentation of its case.  Earl testified that when Lowe was in the hospital on the morning of the crash, she told him that she looked down at her phone to see who had sent her a text message and that as she did so, the car veered to the right and Dam grabbed the wheel from the backseat, causing her to lose control of the car.   After the State's direct examination of Earl, Lowe moved for a mistrial based on an off-the-record discussion regarding the permissible scope of Earl's testimony.  The court denied the motion at sidebar.  After the trial, Lowe renewed her motion for a mistrial in order to preserve her arguments on the record.   In this written motion, Lowe argued, among other things, that Earl had described Lowe's statements from a portion of the interview with Edstrom that the court had suppressed before trial.

[¶15]   The jury found Lowe guilty of both counts of manslaughter, 17-A M.R.S. § 203(1)(A), and guilty of aggravated leaving the scene of a motor vehicle accident, 29-A M.R.S. § 2252(5), but found her not guilty of both counts of aggravated OUI, 29-A M.R.S. § 2411 (1-A)(D)(1-A).  After the trial, Lowe moved for a mistrial, a judgment of acquittal, and a new trial.  A hearing was held and, in an August 2014 order, the court denied all three motions.  For the two manslaughter charges, the court imposed concurrent sentences of eight years in

prison with all but eighteen months suspended, and three years of probation. For the leaving the scene charge, the court imposed a consecutive sentence of four years, fully suspended, and one year of probation. Lowe appeals.

## II. DISCUSSION

### A. Change of Venue

[¶16] Lowe argues that the court erred by denying her motion to change venue based on her claim of extensive publicity surrounding the events of the crash and its impact on families in West Paris and the broader Oxford Hills community. A trial court is required to grant a change of venue due to pre-trial publicity if there is either presumed prejudice or actual prejudice to the defendant due to the publicity. *See State v. Dwyer*, 2009 ME 127, ¶ 20, 985 A.2d 469. We review the court's denial of a motion for a change of venue for an abuse of discretion. *Id.*

[¶17] A court will presume prejudice from pretrial publicity "when the defendant demonstrates that the pretrial publicity has the immediacy, the intensity, or the invidiousness sufficient to arouse general ill will and vindictiveness against the accused at the time of jury selection." *State v. Saucier*, 2001 ME 107, ¶ 15, 776 A.2d 621 (quotation marks omitted). Here, Lowe did not produce any meaningful evidence about the nature of the pre-trial publicity surrounding her case. The court denied Lowe's motion without prejudice, but repeatedly invited her to submit further evidence in support of her claim that the nature of the pre-trial

publicity would prevent her from having a fair trial in Oxford County.[4]  Because Lowe failed to present the court with any such information, the court did not err in concluding that she was not presumptively prejudiced by any pre-trial publicity.

[¶18]  Moreover, Lowe has not demonstrated actual prejudice by showing "that it was not possible to select an impartial jury." *Saucier*, 2001 ME 107, ¶ 20, 776 A.2d 621.  During voir dire, only thirty-five out of 112 potential jurors indicated that they had been exposed to news coverage of the case.  The court excused for cause each of the twelve members of the jury pool who stated that they would be unable to be impartial because of what they knew or had heard about the case.  Similarly, all of the potential jurors who knew Lowe, the victims, or their families were dismissed, and those who indicated that they could not be impartial because they knew witnesses were also dismissed.  None of the impanelled jurors had been challenged for cause by Lowe.

[¶19]  In all, the court dismissed every prospective juror who expressed doubts about his or her ability to be impartial, and Lowe has not suggested any further action that the court should have taken to make sure that none of the jurors was biased.  Nothing in the record suggests that any of the actual jurors was

---

[4]  For example, following the denial of the motion, the court stated, "And if there are, you know, further reasons, I invite the Defendant to submit them in more detail."  Later on in the hearing, the court said, "I'm leaving the issue open for more evidence as to why it should be transferred," and then specifically asked Lowe to submit the newspaper reports and internet comments that she referred to at the hearing.  Finally, the court stated, "I'm keeping an open mind."

affected by pretrial media coverage or any other influencing factor. Accordingly, the court did not abuse its discretion in denying the motion for a change of venue. *Saucier*, 2001 ME 2007, ¶ 21, 776 A.2d 621 (holding that the court did not abuse its discretion by denying a motion for change of venue where all jurors who had formed an opinion about the case were dismissed for cause and all other jurors indicated that they could be impartial).

B.    Testimony of Earl Lowe

[¶20]  Lowe next contends that the court erred by denying her motion for a mistrial based on testimony of her father, Earl Lowe, about statements that she made in the hospital after the accident.  Lowe moved for a mistrial both immediately after Earl's direct testimony, which the court denied at sidebar, and after trial in a written motion, which the court denied after a full testimonial hearing.  Both motions were based on Lowe's contention that Earl's testimony to the jury described statements that Lowe argues were made during the portion of her interview with Edstrom that the court suppressed before trial due to a *Miranda* violation.  "Because the trial court has a superior vantage point, we review the denial of a motion for a mistrial for an abuse of discretion.  We will overrule the denial of a mistrial only in the event of exceptionally prejudicial circumstances or prosecutorial bad faith."  *State v. Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (citation omitted) (quotation marks omitted).

12

[¶21] Earl testified that he spoke with Lowe about the crash when they were at Maine Medical Center before Lowe's interview with Edstrom and while Edstrom was present. Lowe argues that Earl's testimony about the timing of the conversation must be incorrect, because it conflicts with testimony by both Edstrom and Lowe's mother, who testified at the post-trial hearing, that Earl was not with Lowe in her hospital room before the interview. Because, Lowe argues, Earl's testimony about the timing of Lowe's statements cannot be true, he must have actually testified about statements Lowe made during the portion of the interview with Edstrom that was suppressed, and the court should have granted her a mistrial because the introduction of testimony about suppressed portions of the interview was unfairly prejudicial.

[¶22] What Lowe's argument overlooks, however, is that the statements by Lowe that Earl testified about could have been made at any time, not just during the interview. In fact, both Edstrom and Earl himself testified that Earl was *not* present *at any time* during Edstrom's interview with Lowe, and there is no evidence that he was in fact in the room when she made the statements to Edstrom that were later suppressed. Additionally, the statement that Earl described included information that went beyond the statement Lowe made to Edstrom, suggesting that it was not the same statement. Lowe therefore did not establish that Earl's

testimony referred to statements she made during the suppressed portion of the interview.

[¶23] Moreover, as the trial court pointed out in its order denying Lowe's motion for a mistrial, several other witnesses had already testified that Lowe made similar statements to them, thus rendering Earl's testimony cumulative. Even if Earl's testimony was inaccurate about when he spoke with Lowe, therefore, it was not "exceptionally prejudicial," *see Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121,[5] and the court did not abuse its discretion when it denied Lowe's motion for a mistrial.[6]

C.      Evidence of THC Metabolites

[¶24] Lowe contends that the court erred by admitting evidence of the THC metabolites found in her blood sample because the probative value of the evidence was substantially outweighed by the risk of unfair prejudice to Lowe. *See* M.R.

---

[5] In addition to "exceptionally prejudicial circumstances," a court may grant a mistrial where the State acts in bad faith. *State v. Logan*, 2014 ME 92, ¶ 14, 97 A.3d 121 (quotation marks omitted). Here, Lowe argues that both she and the State were surprised by Earl's testimony, which negates any claim of prosecutorial bad faith.

[6] On appeal, although Lowe mentions the issue in her brief, she has not meaningfully developed an argument that the timing of the Earl's testimony unfairly prejudiced her case and that the court erred by allowing Earl to testify during the defense's case. *See Mehlhorn v. Derby*, 2006 ME 110, ¶ 11, 905 A.2d 290 (stating that "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived" (quotation marks omitted)). Even if she properly raised that argument, however, it would be unavailing because Lowe knew in advance that Earl might testify during the defense's case; there was a legitimate explanation why the State was unable to present Earl's testimony earlier in the trial; and the court explained to the jury that he was the State's witness testifying out of order. Thus, the timing of the testimony was not unfairly prejudicial to Lowe. *See State v. Larson*, 577 A.2d 767, 770 (Me. 1990) (concluding that the court did not abuse its discretion when it allowed the State to reopen its case "in the absence of surprise or unfair prejudice to the defense").

Evid. 403.[7]  Because Lowe objected to the testimony about the presence of metabolites at trial, the trial court's admission of evidence over her objection of unfair prejudice pursuant to Rule 403 is reviewed for abuse of discretion.  *See State v. Glover*, 2014 ME 49, ¶ 8, 89 A.3d 1077.[8]

[¶25]  Pursuant to 29-A M.R.S. § 2432(4) (2014), evidence of the presence of "the metabolites of any drug" in a defendant's blood is "admissible evidence, but not prima facie, indicating whether that person is under the influence of intoxicants to be considered with other competent evidence, including evidence of alcohol level."  Thus, the evidence of THC metabolites here was "admissible evidence" pursuant to statute.  If the statute is interpreted to mean that the evidence is admissible under all circumstances without regard to other evidentiary considerations, then the court did not err when it admitted the evidence.

[¶26]  Even if, as Lowe argues, section 2432(4) preserves the court's discretion to exclude statutorily "admissible" evidence when the probative value is substantially outweighed by the danger of unfair prejudice, *see* M.R. Evid. 403, Lowe has not demonstrated that the court erred in admitting the evidence.

[7]  This rule has since been replaced by Rule 403 of the restyled Maine Rules of Evidence, which took effect on January 1, 2015.

[8]  At trial, Lowe also objected to the THC metabolite testimony on the grounds that the State violated discovery rules by not providing her with the data underlying the expert's report until after the trial had started, even though the State timely produced the expert report itself.  *See* M.R. Crim. P. 16(b)(2)(B) (superseded by M.R.U. Crim. P. 16(a)(2)(G)).  She has not pressed that argument on appeal, and we do not address it here.

Evidence of THC metabolites in Lowe's system had significant probative value because it corroborated eyewitness testimony that she had been smoking marijuana before the crash and lent credence to the connection between Lowe and the jacket with marijuana in the pocket. When considered in the context of that evidence, the presence of THC metabolites made it more likely that Lowe was under the influence of drugs at the time of the crash, even if the detection of the metabolites could not show conclusively that Lowe was impaired. Moreover, the risk of any unfair prejudice arising from evidence that Lowe had THC metabolites in her system was minimal given other testimony about her behavior. Because any prejudicial effect of the metabolite evidence does not substantially outweigh its significant probative value, the court did not abuse its discretion in allowing the State's expert to testify regarding the presence of THC metabolites in Lowe's blood.

D.    Sufficiency of the Evidence

[¶27] Lowe contends that the evidence presented to the jury was insufficient to support a guilty verdict on the charges of manslaughter and leaving the scene. When determining whether the evidence is sufficient to support a criminal defendant's conviction, "we view the evidence in the light most favorable to the State to determine whether the fact-finder could rationally find every element of

16

the offense beyond a reasonable doubt." *State v. Sanchez*, 2014 ME 50, ¶ 8, 89 A.3d 1084 (quotation marks omitted).

1.      Manslaughter

[¶28]   As an initial matter, Lowe contends that, for two related reasons, evidence of impairment cannot be considered in evaluating the sufficiency of the evidence on appeal.  First, she argues that the jury's acquittal on the two counts of aggravated operating under the influence represents a finding that she was not impaired at the time of the crash, and thus we are "estopped" from considering evidence of impairment in our review of the jury verdict.  Second, she argues that, in order to acquit her of operating under the influence, the jury must have had a reasonable doubt that she was impaired, and therefore we must assume that the jury did not consider impairment when reaching its manslaughter verdict.  We disagree with both contentions.

[¶29]   We have held that "[m]ere inconsistency between guilty and not guilty verdicts on separate counts of a single indictment will not render the guilty verdict invalid."  *State v. Finnemore*, 1997 ME 44, ¶ 9, 690 A.2d 979.  That is because "[t]he verdict may have been the result of compromise, or of a mistake on the part of the jury," and "[w]e will not speculate" about the reasons behind either an acquittal or a guilty verdict.  *Id.* ¶¶ 7, 9 (quotation marks omitted).  For that same reason, a jury's acquittal of a defendant on one charge does not limit the

evidence that can be considered in a post-trial determination of whether the evidence is sufficient to support the jury's guilty verdict on a different charge.

[¶30] Further, because we do not presume to know the reasons behind the jury's decision, nothing prevents the jury, as it deliberates on multiple charges, from considering facts inconsistent with one verdict in the process of reaching a verdict on another charge. Here, because we will not assume any particular reason for the jury's acquittal of Lowe on the aggravated OUI, we will consider all of the evidence in the record, including evidence of impairment, in determining whether there is sufficient evidence to support the jury's guilty verdicts.

[¶31] We therefore turn to the question of whether, when the evidence is viewed in the light most favorable to the State, the jury could have rationally found every element of manslaughter beyond a reasonable doubt. *See Sanchez*, 2014 ME 50, ¶ 8, 89 A.3d 1084. Pursuant to 17-A M.R.S. § 203(1)(A), "A person is guilty of manslaughter if that person . . . [r]ecklessly, or with criminal negligence, causes the death of another human being." Here, the parties stipulated that the victims' deaths were a result of the crash, and the evidence supported a finding that Lowe was driving at the time of the crash. The only remaining question is whether the evidence was also sufficient to support a finding that Lowe acted "recklessly[] or with criminal negligence." *See id.*

18

[¶32] "A person acts recklessly with respect to a result of the person's conduct when the person consciously disregards a risk that the person's conduct will cause such a result." 17-A M.R.S. § 35(3)(A) (2014). Similarly, someone acts with criminal negligence "when the person fails to be aware of a risk that the person's conduct will cause such a result." 17-A M.R.S. § 35(4)(A) (2014). Both states of mind require "a gross deviation from the standard of conduct that a reasonable and prudent person would observe in the same situation." 17-A M.R.S. § 35(3)(C), (4)(C) (2014).

[¶33] The culpable state of mind required by the statutory definition of manslaughter therefore calls for jurors to resort to their own experiences and common sense in order to identify normative expectations about how "reasonable and prudent" people should act in a particular situation.[9] *See State v. Snow*, 464 A.2d 958, 961 (Me. 1983) (noting that when presented with evidence about a fatal crash, jurors can determine whether the defendant's operation of a motor vehicle was a gross deviation from that of a "reasonable and prudent" person); *see also State v. Carisio*, 552 A.2d 23, 25 (Me. 1988). After making that determination, the jurors must then decide whether a defendant's particular actions,

---

[9] The manslaughter statute is particularly versatile and therefore calls for the fact-finder's judgment to determine the standard of conduct applicable to a variety of factual situations. *See, e.g., State v. Schofield*, 2005 ME 82, ¶¶ 3-5, 895 A.2d 927 (child abuse); *State v. Bleyl*, 435 A.2d 1349, 1353-54 (Me. 1981) (robbery); *State v. Perfetto*, 424 A.2d 1095, 1096-97 (Me. 1981) (hunting fatality); *State v. Pray*, 378 A.2d 1322, 1322-23 (Me. 1977) (bar fight).

arising from a conscious disregard or failure to be aware of a risk, constituted a gross deviation from the standard of conduct they have identified. The jurors in this case were therefore charged with the responsibility of drawing on their common sense and life experiences to determine whether Lowe's conduct constituted a gross deviation from the standard of care that they would expect of a reasonable and prudent person operating a vehicle under the circumstances described at trial. We will leave such a determination undisturbed as long as it is rational. *See State v. St. Yves*, 2000 ME 97, ¶ 23, 751 A.2d 1018.

[¶34] Although there was conflicting evidence, the jury could rationally have concluded that Lowe had consumed alcohol and drugs at the party before the crash and that Lowe knew before she got behind the wheel that she was too drunk to drive. The jury also could have found that Lowe looked at a text message on her phone while she was driving, causing her to drift off the road. Finally, the jury was entitled to accept expert testimony that Lowe, a young and relatively inexperienced driver, was driving seventy-five miles per hour on a two-lane road where the speed limit was only fifty miles per hour and when it was dark and potentially icy. The combination of those factors—drinking, smoking marijuana, driving at an unsafe speed on dangerous road conditions, and looking down at the phone—supports the jury's finding that Lowe's conduct was "a gross deviation" from the standard of

20

care exercised by a reasonable person in her situation and that she therefore acted recklessly or with criminal negligence when the crash occurred.

2. Leaving the Scene of an Accident

[¶35] Pursuant to 29-A M.R.S. § 2252(5) a motor vehicle operator is guilty of a Class C crime of leaving the scene of an accident if she is involved in an accident that causes serious bodily injury or death and she "intentionally, knowingly or recklessly fails to comply" with the statutory responsibilities, which require, among other things, that the operator "remain at the scene" of the accident and "render reasonable assistance to an injured person." *See* 29-A M.R.S. § 2252(2)-(3) (2014). In this case, it is undisputed that Lowe and the surviving passenger left the scene of the crash upon exiting the vehicle.

[¶36] Although leaving the scene to get medical assistance for the remaining passengers would not have been a violation of the statute, *see* 29-A M.R.S. § 2252(3), there was evidence that Lowe and the surviving passenger went by more than twenty houses on their way back to the site of the party and that they did not try to enlist help from anyone at those houses. Additionally, Lowe's repeated inquiries to Edstrom about the well-being of the victims indicate that she believed that they were severely injured, yet several people at the party testified that Lowe asked them not to call 911. Moreover, in addition to leaving the scene of the crash, Lowe also tried to leave the residence before the police arrived, and

the jury could reasonably have inferred that that was because she wanted to avoid questioning about the crash.

[¶37] This evidence was sufficient for the jury to conclude that Lowe intentionally left the scene knowing that the other occupants in the vehicle were severely injured and needed assistance, and that she even tried to dissuade others from reporting the crash and getting help from medical personnel and police. Although Lowe argued that she was not thinking clearly and chose to go to a familiar place to seek help, and that she told people to call 911 upon arriving there, the jury was entitled to accept the contradictory inculpatory evidence and discount her explanation, and to find that she had violated the statute. Thus, the evidence was sufficient to convict Lowe of aggravated leaving the scene of a motor vehicle accident.

### III.  CONCLUSION

[¶38] For the foregoing reasons, we find no error in the trial court's actions or the jury's verdict in this case. To the contrary, the court adeptly handled a publicized and emotional case and thoughtfully decided the evidentiary issues presented in order to provide Lowe with a fair trial.

The entry is:

Judgment affirmed.

**On the briefs:**

James P. Howaniec, Esq., Lewiston, for appellant Kristina I. Lowe

Andrew S. Robinson, District Attorney, and Joseph M. O'Connor, Asst. Dist. Atty., Office of the District Attorney, South Paris, for appellee State of Maine

**At oral argument:**

James P. Howaniec, Esq., for appellant Kristina I. Lowe

Joseph M. O'Connor, Asst. Dist. Atty., for appellee State of Maine

Oxford County Superior Court docket number CR-2012-162
FOR CLERK REFERENCE ONLY