MAINE SUPREME JUDICIAL COURT                                   Reporter of Decisions
Decision:       2020 ME 83
Docket:         Aro-19-329
Submitted
  On Briefs:    April 14, 2020
Decided:        June 4, 2020

Panel:          MEAD, GORMAN, JABAR, HUMPHREY, HORTON, and CONNORS, JJ.

## STATE OF MAINE

v.

## JONATHAN LIMARY

HORTON, J.

[¶1]   Jonathan Limary appeals from a judgment of conviction of manslaughter (Class A), 17-A M.R.S. § 203(1)(A) (2020), and aggravated assault (Class B), 17-A M.R.S. § 208(1)(A) (2020), entered by the court (Aroostook County, *Stewart, J.*) after a jury trial.  Limary argues that the court deprived him of a fair trial by denying his request during jury voir dire to pose certain questions in the jury questionnaire, and that the evidence was insufficient to support a finding that Limary's actions—rather than subsequent medical treatment—caused the victim's death.  We affirm the judgment.

### I.  BACKGROUND

[¶2]  Viewing the evidence in the light most favorable to the State, the jury could rationally have found the following facts beyond a reasonable doubt.

2

*See State v. Asaad*, 2020 ME 11, ¶ 8, 224 A.3d 596.  Late on the night of October 29, 2017, Limary and some friends had a dispute, via text-based and voice-based social media, with the victim—a man whom none of them had met. As a result, Limary and a friend of his—with three others in the vehicle—drove from Presque Isle to Caribou to meet up with the victim and his friend in a parking lot to fight.  While Limary and the victim's friend fought, Limary's friend fought with the victim.  Limary's friend and the victim ended up on the ground, and Limary's friend eventually got up and backed away from the victim.  By then, another friend of the victim had arrived with his teenage son and had gone over to help the victim up off the ground.  Before the victim could rise from his knees, Limary approached and forcefully kicked the victim in the face, resulting in numerous fractures to the victim's nose, eye orbits, upper jaw, and cheek bones.

[¶3]  The victim received medical care in the early morning hours of October 30 and was released, but he returned to the hospital later that day and was admitted.  He was released on November 2.  He then had two surgeries on November 9 and was released on November 17.  For purposes of the surgeries, a tracheostomy tube was inserted; that tube was removed two days before the

3

victim's release from the hospital, leaving the victim with a healing hole in his throat at the incision site where the tracheostomy tube had been.

[¶4]  On the day that the victim was released, his friend and the friend's son brought him to their house.  That evening, the victim began bleeding from the opening in his neck, and his friend called 9-1-1.  Under the guidance of the dispatcher, the victim's friend performed CPR until the ambulance arrived.  The victim bled profusely, and, despite the paramedics' resuscitation efforts, he died.  An autopsy revealed that, although at least some blood exited the victim through the tracheostomy site,[1] more extensive hemorrhaging occurred in the victim's sinuses.[2]

[¶5]  In January 2018, Limary was charged by indictment with manslaughter (Class A), 17-A M.R.S. § 203(1)(A), and aggravated assault (Class B), *id.* § 208(1)(A).  He pleaded not guilty, and the matter proceeded to a jury trial.

---

[1] There was also evidence of bleeding from the nose and of blood having entered the stomach and lungs.

[2] From these facts, the jury could rationally have found beyond a reasonable doubt that Limary committed the aggravated assault by "intentionally, knowingly or recklessly caus[ing] . . . [b]odily injury to another that create[d] a substantial risk of death or extended convalescence necessary for recovery of physical health."  17-A M.R.S. § 208(1)(A) (2020); *see* 17-A M.R.S. § 35(1)-(3) (2020). The sufficiency of the evidence of manslaughter is discussed below.

4

[¶6] Jury selection was held on May 13, 2019. The court refused to include on the jury questionnaire three of the questions that Limary proposed relating to self-defense and defense of another:

- "[I]f during the trial Mr. Limary generates evidence that he acted in self-defense or in the defense of another in using physical force against [the victim], the State must prove beyond a reasonable doubt that Mr. Limary did not act in self-defense or defense of another. Would you have any difficulty applying this burden on the State to disprove self-defense or defense of another beyond a reasonable doubt?"

- "[W]ould you be willing to find Mr. Limary not guilty if he acted in self-defense or in defense of another in using physical force against [the victim]?"

- "[D]o you have any personal, religious, philosophical or other beliefs that a person is never justified in using physical force against another human being even if it is done in self-defense or defense of another?"

The court reasoned that it was not evident that a self-defense or defense-of-another instruction would be generated by the evidence. The court indicated that it would ask "whether or not jurors would have . . . any difficulty in being a fair and impartial juror when fighting has occurred." The questionnaire presented to the potential jurors included such a question and also asked the jurors if they would be able to "base their verdict upon the evidence and according to the law" without allowing "any feelings of bias, prejudice, pity, anger, sympathy or other emotion [to] influence their verdict in

any way" and if they would be able to follow the law as instructed by the court "even if [they] d[id] not agree with the law."

[¶7]  After the potential jurors completed the questionnaire, the court conducted individual voir dire.  Both the State and Limary agreed that the jury that was ultimately selected was satisfactory.

[¶8]  The jury trial was held over the course of the next four days.  The State offered testimony from eyewitnesses, a paramedic who treated the victim on the day of his death, a police officer, and the State's Chief Medical Examiner. The State offered no evidence that would suggest that Limary had acted in self-defense or defense of another.  The medical examiner testified that, before performing an autopsy of the victim, he reviewed hospital records summarizing the multiple, serious fractures to the victim's face.  He also considered a post-surgery x-ray showing the surgeons' use of braces and other materials to reconstruct the victim's face.  The autopsy revealed no hemorrhaging in the area of the tracheostomy but extensive hemorrhaging in the sinuses, where the victim had sustained the injuries and undergone surgery.  The medical examiner concluded that the victim died of blood loss—specifically, "hemorrhagic complications following multiple fractures of facial bones due to the blunt force trauma of his head."

6

[¶9] Limary moved for a judgment of acquittal on the manslaughter charge, arguing that the victim's surgery, which he claims was elective, broke the chain of causation between his actions and the victim's death such that the jury could not find him guilty of manslaughter. *See* M.R.U. Crim. P. 29. The court denied the motion.

[¶10] Limary then offered an expert witness—the Chief Medical Examiner for the State of Maryland—whose testimony differed from the State's Chief Medical Examiner's mainly in identifying the source of the victim's bleeding as one or more veins at the site of the tracheostomy, not the site of Limary's injuries and surgery.[3] Limary also offered his own testimony that he had kicked the victim in the mouth to protect his friend because he thought the victim was getting up to continue fighting and he wanted to get away from the victim and his friends.

[¶11] In its instructions to the jury, the court provided instructions on self-defense and defense of another. The jury found Limary guilty of both the manslaughter and aggravated assault charges. After a sentencing hearing, the court sentenced Limary to sixteen years in prison for manslaughter, with all but

---

[3] Through cross-examination, it became clear that, when the expert prepared his report, he had mistakenly believed that the tracheostomy tube had still been in the victim's throat when he died.

forty-five months suspended and four years of probation. For the conviction of aggravated assault, the court sentenced Limary to forty-five months in prison, to be served concurrently with the manslaughter sentence. The court also ordered Limary to pay $70 plus restitution of $2,519 to the Victims' Compensation Fund. Execution of the sentence was stayed pending appeal. *See* M.R.U. Crim. P. 38(a). Limary timely appealed. 15 M.R.S. § 2115 (2020); M.R. App. P. 2B(b)(1).

## II. DISCUSSION

[¶12] Limary challenges (A) the court's denial of his request to pose questions regarding self-defense and defense of another in the juror questionnaire and (B) the sufficiency of the evidence that he caused the victim's death. We address each issue in turn.

A. Juror Questionnaire

[¶13] Limary argues that he was deprived of a fair and impartial jury because the questionnaire did not specifically inquire of the jurors whether they were able to be fair and impartial regarding issues of self-defense and defense of another. He contends that, unlike in *State v. Burton*, 2018 ME 162, ¶ 17 & n.2, 198 A.3d 195, the court did not include other questions regarding self-defense or defense of another that would satisfy the concerns he raised.

[¶14]  We review challenges to the conduct of voir dire for abuse of discretion. *State v. Roby*, 2017 ME 207, ¶ 11, 171 A.3d 1157. "[T]he purpose of the voir dire process is to detect bias and prejudice in prospective jurors, thus ensuring that a defendant will be tried by as fair and impartial a jury as possible." *Burton*, 2018 ME 162, ¶ 15, 198 A.3d 195 (quotation marks omitted). Thus, a trial court has considerable discretion over the scope of voir dire provided that it is adequate to disclose facts that would reveal juror bias. *Id.*

[¶15]  A court need not voir dire potential jurors in the exact manner requested by a party as long as the process is sufficient to reveal bias. *Roby*, 2017 ME 207, ¶ 13, 171 A.3d 1157.  Nor does a court abuse its discretion in excluding questions "that have no relationship to a prospective juror's knowledge, bias, or predisposition, or that are intended to advocate a party's position regarding the facts or issues in dispute." *Roby*, 2017 ME 207, ¶ 11, 171 A.3d 1157 (quotation marks omitted).

[¶16]  For purposes of the United States Constitution, "[t]o be constitutionally compelled, . . . it is not enough that [voir dire] questions might be helpful.  Rather, the trial court's failure to ask these questions must render the defendant's trial fundamentally unfair." *Mu'Min v. Virginia*, 500 U.S. 415, 425-26 (1991).  For instance, the United States Supreme Court has determined

that voir dire questions about racial bias may be constitutionally required, particularly in death penalty cases. *See Turner v. Murray*, 476 U.S. 28, 35-36 (1986); *Rosales-Lopez v. United States*, 451 U.S. 182, 190 (1981) (holding that, although there is no presumption of racial bias, a court may be required to ask voir dire questions about race if there are "substantial indications of the likelihood of racial or ethnic prejudice affecting the jurors in a particular case"); *Aldridge v. United States*, 283 U.S. 308, 314-15 (1931) (vacating a judgment of conviction of murder, for which the defendant had been sentenced to death, because the court failed to inquire of the jurors regarding racial bias).

[¶17]  Consistent with this jurisprudence, the *Maine Jury Instruction Manual*, widely used in civil and criminal jury trials in Maine, recommends that the trial court consider specific voir dire in cases that "may involve particularly sensitive issues such as race, religion, sexual preferences, interpersonal or sexual violence, or child abuse."  Alexander, *Maine Jury Instruction Manual* § 2-4 at 2-6 (2019-2020 ed. 2019).  The same resource recommends that during jury voir dire the trial court "describe the basic law applicable to the case—in criminal cases, the presumption of innocence, the State's beyond a reasonable doubt standard of proof, the defendant's right to remain silent and not present any evidence—and then ask the jurors if they were willing and able to accept

and apply the law to the case if they were selected as jurors, regardless of any personal view they may have as to what the law should be." *Id.* § 2-4E at 2-20. In this case, all of these principles were addressed in the written jury questionnaire.

[¶18] On the other hand, the *Manual* recommends against "[q]uestions that ask about jurors' knowledge or beliefs about the law and whether the jurors agree with the law as stated by counsel." *Id.* § 2-4F at 2-24 ("Voir dire is not a mini bar exam for citizen jurors untrained in the law.").

[¶19] The principles set forth in the *Manual* are consistent with, and derive from, our own jurisprudence. "A voir dire of jurors becomes essential when the potential for bias and prejudice is manifest." *State v. Barczak*, 562 A.2d 140, 142 (Me. 1989). "Whether prejudice is manifest is a question of fact for the trial court's determination and the scope of an examination is a matter of discretion for the court." *Id.* Based on the evidence anticipated in a case, therefore, special inquiry of jurors during voir dire may be required with respect to potential bias regarding matters such as race and sexual orientation, pretrial publicity, and law enforcement connections. *See State v. Bethea*, 2019 ME 169, ¶¶ 15-19, 221 A.3d 563; *State v. Turner*, 495 A.2d 1211, 1212-13 (Me. 1985); *State v. Lovely*, 451 A.2d 900, 901-02 (Me. 1982); *see also*

Alexander, *Maine Jury Instruction Manual* § 2-4I at 2-31 to 2-32 (including sample jury questions about pretrial publicity); *cf. State v. Saucier*, 2001 ME 107, ¶ 21, 776 A.2d 621 (affirming the denial of a motion to change venue in part because voir dire questions about pretrial publicity had been posed to the jury). Applying these principles, we held that jury voir dire was inadequate when trial courts precluded inquiry into the nature of jurors' associations with prospective law enforcement witnesses, *State v. O'Hara*, 627 A.2d 1001, 1003 (Me. 1993), and jurors' past experiences with violent crime, *State v. Lowry*, 2003 ME 38, ¶¶ 10-11, 819 A.2d 331.

[¶20] In many circumstances, it will be necessary for a defendant to provide evidence of potential bias for voir dire to be required. *See, e.g.*, *State v. Lowe*, 2015 ME 124, ¶ 17, 124 A.3d 156 (holding that there was insufficient evidence that pretrial publicity generated a potential for bias); *see also United States v. Robinson*, 475 F.2d 376, 381 (D.C. Cir. 1973) (holding that, when no recognized class of societal bias is involved, "it is incumbent upon the proponent to lay a foundation for his question by showing that it is reasonably calculated to discover an actual and likely source of prejudice, rather than pursue a speculative will-o-the-wisp").

12

[¶21] In a case in which the defendant was a patron of a gay bar, however, we in effect took judicial notice of societal prejudice that compelled inquiry on the subject of anti-gay bias. *See Lovely*, 451 A.2d at 901-02 (acknowledging the undeniable "stigmatization of homosexuals in our society" and concluding that the trial court was required to inquire about anti-gay bias during jury voir dire when the evidence suggested that the defendant had been a patron of a gay bar). The common theme in our jury voir dire jurisprudence has been to require inquiry into jurors' attitudes and experiences involving the parties and witnesses or involving specific areas of evidence when there is a more than speculative potential for juror bias.

[¶22] As to legal defenses and justifications—as opposed to questions regarding potential evidence-based and status-based biases against parties or expected witnesses—some courts in other states have decided that several possible defenses and justifications, including self-defense, are sufficiently "controversial" that they must be specifically explored during voir dire if requested by a party. *See Griffin v. State*, 389 S.W.2d 900, 902 (Ark. 1965) (self-defense); *People v. Gregg*, 732 N.E.2d 1152, 1163 (Ill. App. Ct. 2000) ("Although the insanity defense upon which the defendant relied is a well-recognized legal defense, it remains a subject of intense controversy and

has been described as 'a defense which is known to be subject to bias or prejudice.'" (quoting *People v. Bowel,* 488 N.E.2d 995, 999 (Ill. 1986))); *People v. Taylor*, 489 N.W.2d 99, 101 (Mich. Ct. App. 1992) (per curiam) (self-defense and the use of deadly force); *cf. People v. Keenan*, 758 P.2d 1081, 1123 (Cal. 1988) (holding that sequestered voir dire may be required in a death penalty case as to "potentially controversial defenses" such as self-defense).

[¶23] The majority of the other courts that have considered whether a requested self-defense question must be posed to potential jurors during voir dire, however, hold that the determination is in the discretion of the trial court based on the circumstances before it. *See State v. Ebron*, 975 A.2d 17, 26 & n.14 (Conn. 2009), *overruled in part on other grounds by State v. Kitchens*, 10 A.3d 942, 959 (Conn. 2011); *see, e.g., Robinson*, 475 F.2d at 380-81 (holding that, although it may have been preferable for the trial court to inquire about juror attitudes toward self-defense, the refusal to do so did not prejudice the defendant's substantial rights); *Simpson v. State*, 276 So. 3d 955, 958 (Fla. Dist. Ct. App. 2019) ("This Court has recognized that no bright line rule can be fashioned to determine the limits a trial court may impose on voir dire because the complexities in each case are different."); *State v. Bedford*, 529 N.E.2d 913, 920 (Ohio 1988) ("The scope of voir dire is within the trial court's discretion

and varies depending on the circumstances of each case."); *see also Savo v. State*, 382 P.3d 1179, 1182 (Alaska Ct. App. 2016) (vacating a conviction when the court refused to allow requested voir dire when "the evidence already known to the State provided support for th[e] claim of self-defense").

[¶24]  We have not identified any particular defense or justification as being sufficiently "controversial" to warrant special inquiry during jury voir dire whenever raised and cannot now conclude that the law regarding defense of self or others is sufficiently controversial to justify elevating its significance above the many other potential forms of bias that could, in theory, be the subject of specific inquiry during jury voir dire.  We are not persuaded that there exists societal bias against the law of defense of self or others to the extent that the constitutional right to a fair trial compels specific voir dire inquiry during jury selection.  *See Commonwealth v. Fisher*, 290 A.2d 262, 264 (Pa. 1972) (holding that there was no evidence of widespread bias against the self-defense justification); *Commonwealth v. Morales*, 800 N.E.2d 683, 694 (Mass. 2003) ("There is no reason to suspect juror prejudice against claims of self-defense and the defendant has not shown a substantial risk of juror bias against such a defense.").

[¶25] To the extent that we have addressed voir dire about self-defense, we affirmed a trial court's decision not to ask the following question regarding self-defense in a murder case:

> The law allows a person to use deadly force against another person in self-defense. Do you have any beliefs or opinions that would prevent you from applying the law of self-defense if the Court provided such an instruction in this case?

*Burton*, 2018 ME 162, ¶ 7, 198 A.3d 195 (quotation marks omitted). We held that the proposed question was not required to ensure impartiality and that the question about self-defense that the court did ask—which stated that the law allowed the use of deadly force in self-defense "in certain circumstances"—was sufficient to reveal juror bias. *Id.* ¶17 & n.2 (emphasis omitted) (quotation marks omitted). We affirmed the judgment based on the adequacy of the questions asked to determine bias and the availability of individual voir dire of the potential jurors. *Id.* ¶¶ 17 & n.2, 19.

[¶26] Unlike the jury question propounded by the court in *Burton*, the three questions that Limary proposed regarding self-defense and defense of another did not indicate that a person's rights of self-defense and defense of others are limited, *see* 17-A M.R.S. § 108(1)-(2) (2020),[4] and, in that respect,

---

[4] At the time of the crime at issue here, subsection 3 of 17-A M.R.S. § 108 (2020) had not yet taken effect. *See* P.L. 2019, ch. 462, § 2 (effective Sept. 19, 2019).

they failed to provide accurate statements of the law. *See Burton*, 2018 ME 162, ¶ 17 n.2, 198 A.3d 195. The court was justified in declining to adopt them as phrased. *See Roby*, 2017 ME 207, ¶ 14, 171 A.3d 1157.

[¶27] Although the court could well have included an appropriate question regarding self-defense and defense of another based on Limary's contention that those issues would likely be generated at trial, the court did not abuse its discretion in declining to include such a question. Limary did not supply an evidentiary basis to establish societal bias against the law of self-defense or defense of another, *cf. Lowe*, 2015 ME 124, ¶ 17, 124 A.3d 156; it was not clear whether the evidence would generate either justification, which increased the risk that the question would amount to improper pretrial advocacy, *see Roby*, 2017 ME 207, ¶ 11, 171 A.3d 1157; and Limary's concerns regarding bias against the law of self-defense and defense of another were addressed by the court's questions about whether the jurors could follow all of the court's instructions, even if they disagreed with the law, including when there had been fighting.[5] Ultimately, Limary agreed that the jury that was selected was acceptable, and there is no evidence of bias in any particular juror

---

[5] The written jury questionnaire asked jurors whether they could follow the law in five different questions.

or in the jury as a whole as a result of the court's exclusion of the requested instructions. Because the questions asked in the questionnaire were adequate to reveal facts that would identify any bias against applying the existing law and there is no evidence that Limary was deprived of an impartial jury, we will not vacate the judgment on this basis. *See Burton*, 2018 ME 162, ¶ 15, 198 A.3d 195.

B.    Sufficiency of the Evidence of Causation

[¶28]  Limary argues that, because the victim did not die until eighteen days and two surgeries after the fight, the evidence cannot support a finding that, but for Limary's conduct, the death would not have occurred or that his conduct was the legal cause of the victim's death. He contends that the kick was a "non-dispositive event" that did not, beyond a reasonable doubt, cause the victim's death because the victim had elective surgery and was released in stable condition. He contends that there was no evidence that the kick caused the bleeding that occurred on November 17, 2017.

[¶29]  When a defendant challenges the sufficiency of the evidence to support a conviction, we view the evidence in the light most favorable to the State to determine whether a trier of fact rationally could find beyond a reasonable doubt each element of the offense charged. *Asaad*, 2020 ME 11, ¶ 8, 224 A.3d 596. "The fact-finder may draw all reasonable inferences from the

18

evidence, and decide the weight to be given to the evidence and the credibility to be afforded to the witnesses." *Id.* (quotation marks omitted).

[¶30] "A person is guilty of manslaughter if that person . . . [r]ecklessly, or with criminal negligence, causes the death of another human being." 17-A M.R.S. § 203(1)(A). Limary does not contest the sufficiency of the evidence that he acted recklessly or with criminal negligence. *See* 17-A M.R.S. § 35(3)(A), (C), (4)(A), (C) (2020) (defining "recklessly" and "criminal negligence"). He argues only that the evidence did not permit the jury to find beyond a reasonable doubt that his conduct caused the victim's death.

[¶31] At the time of the fight, the statute governing causation stated, "Unless otherwise provided, when causing a result is an element of a crime, causation may be found where the result would not have occurred but for the conduct of the defendant operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the defendant was clearly insufficient." 17-A M.R.S. § 33 (2017).[6]

---

[6] The language regarding concurrent causation was amended, effective after the events at issue here, to state the concurrent causation standard in the affirmative and in a separate paragraph, using simplified language:

[¶32]   "Section 33 expressly imposes limitations on causative responsibility and imposes standards similar to the common law standards of proximate cause."  *State v. Snow*, 464 A.2d 958, 962 (Me. 1983).  Thus, the foreseeability of events or conditions contributing to the victim's death becomes relevant.  *See State v. Shanahan*, 404 A.2d 975, 983 (Me. 1979); *see also United States v. Kilmartin*, 944 F.3d 315, 331 (1st Cir. 2019) ("Proximate cause is commonly understood as a function of the foreseeability of the harm.").  In applying section 33, "the State must prove beyond a reasonable doubt not only that the result would not have occurred but for the conduct of the defendant, but also that the concurrent cause was not alone clearly sufficient to produce the result and that the conduct of the defendant was not clearly insufficient to produce the result."  *Snow*, 464 A.2d at 962; *see also State v. Crocker*, 431 A.2d 1323, 1325 (Me. 1981).

---

**§ 33. Result as an element; causation**

   **1.**  Unless otherwise provided, when causing a result is an element of a crime, causation may be found when the result would not have occurred but for the conduct of the defendant, operating either alone or concurrently with another cause.

   **2.**  In cases in which concurrent causation is generated as an issue, the defendant's conduct must also have been sufficient by itself to produce the result.

17-A M.R.S. § 33 (2020) (codifying P.L. 2017, ch. 432, § C-1 (emergency, effective July 4, 2018)); *see* L.D. 1091, Summary (128th Legis. 2017) ("Subsection 2 contains a simplified test to be applied in the event concurrent causation is generated as an issue.  It provides that, when a defendant's conduct may have operated concurrently with another cause, in addition to satisfying the 'but for' test the defendant's conduct must have been sufficient by itself to produce the result . . . .").

20

[¶33]  The evidence plainly supported a jury finding that the victim underwent surgeries to repair injuries caused by Limary's kick and that those surgeries would not have occurred but for Limary's actions.  The question is whether the evidence was sufficient for the jury to find, beyond a reasonable doubt, that the surgeries were not the sole cause of death and that Limary's actions were not "clearly insufficient" to cause the death.  17-A M.R.S. § 33.  In other words, we must decide whether the medical treatment undertaken before the victim's death was, as a matter of law, an intervening—rather than merely a concurrent—cause of the victim's death, negating criminal liability.

[¶34]  We have not explicitly announced a rule regarding concurrent versus intervening causes of death in the context of medical treatment of an injured victim.  In *State v. Hachey*, 278 A.2d 397, 400-01 (Me. 1971), however, we affirmed a murder conviction when, although the victim received medical care, including a tracheostomy, after the defendant shot him, the victim ultimately died of infection: "Certainly [the jury] could find that the cause of the septicemia was the entry of the bullet into the body of the decedent."  *Id.*[7]

---

[7] We reached this holding at common law because no statute equivalent to section 33 was in force until the adoption of the Maine Criminal Code in the mid-1970s.  *See* P.L. 1975, ch. 499, § 1 (effective Mar. 1, 1976) (codified at 17-A M.R.S.A. § 56 (1979)).  As the bill's comment reveals, the new statutory language was taken from a proposed Massachusetts Code and based on the proposed Federal Criminal Code.  L.D. 314, § 1, cmt. to 17-A M.R.S.A. § 56 (107th Legis. 1975).  The federal drafters specifically noted that "[t]he major problem in enunciating such rules is presented by situations in which two or more factors 'cause' the result."  Nat'l Comm'n on Reform of Fed. Criminal Laws, Final

[¶35] In other concurrent causation contexts, we similarly held that a jury could find causation, despite other events or circumstances that may have contributed to the victim's death. For instance, we concluded that the evidence was sufficient to support a manslaughter conviction when the medical examiner testified that a wound inflicted by the defendant, which was accompanied by other injuries not inflicted by the defendant, would eventually have caused death if untreated. *State v. Morelli*, 493 A.2d 336, 338-40 (Me. 1985); *see also State v. Cumming*, 634 A.2d 953, 954, 956-57 (Me. 1993) (affirming a murder conviction when, although the pathologist could not distinguish which injuries resulted from the victim leaping or being pushed from the defendant's car and which injuries resulted from him then driving over her, the evidence could support a jury finding that the victim was alive when she was run over); *State v. Peaslee*, 571 A.2d 825, 826-27 (Me. 1990) (affirming a vehicular manslaughter conviction when the defendant's passenger was thrown from the vehicle and then run over by another car because the victim would not have been in the road if not for the defendant's

_____

Report 32 (1971). The section was proposed as "a modified 'but for' test with a proviso that excludes those situations in which the concurrent cause was clearly sufficient to produce the result and the accused's conduct clearly insufficient. . . . 'But for' is a minimal requirement for guilt; and resolving that question permits focusing on the more important issue of culpability as to the result caused." *Id.*

conduct); *State v. Reardon*, 486 A.2d 112, 116-18 (Me. 1984) (affirming a trial court's finding of causation in a felony murder case because it was reasonably foreseeable that a sixty-seven-year-old robbery victim would have a heart attack due to the stress of the robbery, his foreseeable attempt to chase the perpetrator, and his agitated explanation of the robbery to police); *Shanahan*, 404 A.2d at 983 (holding that the victim's foreseeable conduct in attempting to wrest the gun away from the defendant was not, "as a matter of law, an intervening cause relieving defendant of criminal responsibility for her death").

[¶36] Other jurisdictions have more specifically held that when medical treatment is provided to an injured victim, negligent treatment cannot be an intervening cause "unless the doctor's treatment is so bad as to constitute gross negligence or intentional malpractice." 1 Wayne R. LaFave, *Substantive Criminal Law* § 6.4(f)(5) at 658-59 (3d ed. 2018). These courts have held that gross negligence, which is not reasonably foreseeable, can be an intervening cause if the fact-finder determines that the victim would have survived without that gross negligence. *See People v. Calvaresi*, 534 P.2d 316, 319 (Colo. 1975) ("[M]ere medical negligence can reasonably be foreseen. We hold, however, that gross negligence is abnormal human behavior, would not be reasonably foreseeable, and would constitute a defense, if, but for that gross negligence,

death would not have resulted."); *State v. Soucy*, 653 A.2d 561, 565 (N.H. 1995) ("The majority of jurisdictions . . . have adopted what has been termed a 'sole' cause test, under which malpractice constitutes a supervening cause only if it was the 'sole' cause of the death."); *cf. State v. Jackson*, 223 N.W.2d 229, 233-34 (Iowa 1974) (holding, with respect to *ordinary* negligence, that "[a]n injury is the proximate cause of resulting death although the deceased would have recovered had he been treated by the most approved surgical methods or by more skillful methods, or with more prudent care").

[¶37]   Applying these generally accepted standards, courts have concluded that a jury could find causation despite interceding medical treatment when there was no evidence that the medical care was grossly negligent, *see People v. Saavedra-Rodriguez*, 971 P.2d 223, 228-29 (Colo. 1998); when the wound was so dangerous on its own that the medical treatment could not have been the sole cause of death, *see State v. Shabazz*, 719 A.2d 440, 444-45 (Conn. 1998); *Wright v. State*, 374 A.2d 824, 827, 828-29 (Del. 1977); *State v. Surbaugh*, 786 S.E.2d 601, 607-08, 616 (W. Va. 2016); and when nonnegligent emergency treatment caused some bleeding but not enough to cause the victim's death, *Neal v. State*, 722 S.E.2d 765, 768 (Ga. 2012).[8]

---

[8] In contrast, a court found that the evidence was *insufficient* to establish causation beyond a reasonable doubt when the victim was stabbed in the stomach and during surgery, the surgeons

24

[¶38] Here, there is no evidence of medical negligence—much less gross medical negligence—nor any evidence that the surgery was for any purpose other than to treat the injuries inflicted on the victim by Limary. *Cf. id.* Although there was evidence that the victim could have deferred the surgery, the surgery was entirely foreseeable and was not cosmetic; the medical examiner opined that the stability of the victim's face was at risk and that, without surgery, he would be in danger of bleeding or of the bones in his face healing badly and impeding his breathing. The medical examiner also testified that a bone shard could have severed multiple blood vessels and caused the type of excessive sinus bleeding that he concluded had occurred here. Given this evidence, and the medical examiner's specific determination that the victim died of "hemorrhagic complications following multiple fractures of facial bones due to the blunt force trauma of his head," the jury could rationally find that the surgery was not the sole cause of the bleeding and that the damage inflicted

---

discovered an incarcerated hernia, which they proceeded to correct after the initial surgery. *People v. Stewart*, 358 N.E.2d 487, 489-90 (N.Y. 1976). During that second surgical procedure, the victim went into cardiac arrest. *Id.* at 490. The medical examiner testified that the cardiac arrest could have been caused by the shock of the stab wound or by the physical strain of either operation; he also testified that the anesthesiologist's report and surgeons' report were contradictory about whether the anesthesiologist had failed to deliver oxygen to the victim, which alone could have caused the victim's death. *Id.* at 490-91. The court concluded that it could not be ruled out as a possibility that the hernia operation had caused the victim's death, "certainly not beyond a reasonable doubt." *Id.* at 492.

through the kick was not "clearly insufficient" to cause death. *See* 17-A M.R.S. § 33.

[¶39] Based on the evidence in the record, the jury could rationally find beyond a reasonable doubt that (1) the victim's death "would not have occurred but for the conduct of the defendant, operating either alone or concurrently with another cause"; and (2) the medical care was not "clearly sufficient," and the kick to the victim's face was not "clearly insufficient," to cause the victim's death. 17-A M.R.S. § 33; *see Calvaresi*, 534 P.2d at 319; *Soucy*, 653 A.2d at 565. We therefore affirm the judgment of conviction.

The entry is:

Judgment affirmed.

---

Hunter J. Tzovarras, Esq., Bangor, for appellant Jonathan Limary

Aaron M. Frey, Attorney General, and Katie Sibley, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine

Aroostook County Unified Criminal Docket docket number CR-2018-12
FOR CLERK REFERENCE ONLY